Silvestris *v.* Tantasqua Regional School District.

JOANNE SILVESTRIS *vs.* TANTASQUA REGIONAL SCHOOL
DISTRICT
(and a companion case[1]).

Hampden. March 7, 2006. - May 18, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Anti-Discrimination Law,* Employment, Sex. *Employment,* Discrimination.
*Limitations, Statute of. School and School Committee,* Compensation of
personnel. *Practice, Civil,* Findings by judge.

An action brought by female teachers (plaintiffs) against a regional school
district (defendant), claiming violations of the Massachusetts Equal Pay
Act, G. L. c. 149, § 105A, was not barred by the applicable six-month
limitations period contained in G. L. c. 151B, § 5, where the statute was
tolled by operation of 804 Code Mass. Regs. § 1.10(2) (1999), when the
plaintiffs entered into grievance proceedings with the defendant concerning
the alleged discriminatory act within six months of the conduct complained
of, and subsequently filed a complaint with the Massachusetts Commission
Against Discrimination within six months of the outcome of those
proceedings. [764-770]

Female teachers (plaintiffs) were not entitled to prevail on their claims under
the Massachusetts Equal Pay Act, G. L. c. 149, § 105A, against a regional
school district (district), alleging that the plaintiffs' starting salaries were
set lower than those of male teachers because the plaintiffs were given less
credit for prior work experience, where the evidence demonstrated that the
superintendent of the district allocated credit for prior work experience
without any well-defined and articulated criteria, and that such allocation
did not have a disproportionately discriminatory impact on women.
[770-777]

CIVIL ACTIONS commenced in the Superior Court Department
on June 28, 2000.

The cases were heard by *Judd J. Carhart,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Maria E. DeLuzio (Karen W. Peters* with her) for Tantasqua
Regional School District.

*Cornelius J. Moriarty, II,* for for Joanne Silvestris & another.

---

[1]Valerie A. Goncalves *vs.* Tantasqua Regional School District.

The following submitted briefs for amici curiae:

*Danielle Y. Vanderzanden & Douglass C. Lawrence* for Associated Industries of Massachusetts.

*Thomas F. Reilly,* Attorney General, *Catherine C. Ziehl, & Zoe Butler-Stark,* Assistant Attorneys General, for the Attorney General.

*Sara Smolik, Robert Mantell, & Elizabeth A. Rodgers* for National Employment Lawyers Association, Massachusetts Chapter.

SPINA, J. Joanne Silvestris and Valerie Goncalves (collectively, plaintiffs) are teachers in the technical division of Tantasqua regional high school (Tantasqua).[2] On July 14, 1999, each filed a discrimination charge against the Tantasqua regional school district (school district) with the Massachusetts Commission Against Discrimination (MCAD), claiming that the school district had violated the Massachusetts antidiscrimination statute, G. L. c. 151B, and the Massachusetts Equal Pay Act (MEPA), G. L. c. 149, § 105A, by "failing to pay [them] salary and benefits equal to what male employees received from work of comparable character." Eleven months later, Silvestris and Goncalves each filed a complaint against the school district in the Superior Court, alleging only that the school district's conduct in paying them less than their male colleagues constituted wage discrimination in violation of MEPA. The thrust of the plaintiffs' allegations was that, when they were hired by the superintendent of schools for the school district (superintendent), their starting salaries were set lower than the starting salaries of male teachers in the technical division because they were given less credit for their prior work experience. In its answer to each complaint, the school district asserted, as an affirmative defense, that the plaintiffs' actions were barred by the applicable statute of limitations. In response to a motion of the school district, agreed to by the plaintiffs, the two actions were consolidated.

The plaintiffs then amended their complaints to add claims alleging that the school district's conduct in establishing their starting salaries had violated G. L. c. 151B and the Massachusetts

---

[2]Tantasqua has both an academic and a technical division. The technical division is, in essence, a vocational school.

Equal Rights Act (equal rights act), G. L. c. 93, § 102. The school district again raised the statute of limitations as an affirmative defense in its answers. The parties presented their evidence to the judge in a jury-waived trial. At the close of all the evidence, the plaintiffs' claims under the equal rights act were dismissed pursuant to Mass. R. Civ. P. 41 (b) (2), 365 Mass. 803 (1974). After the judge made findings of fact and conclusions of law pursuant to Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996), he entered judgment for the school district with respect to the plaintiffs' claims under G. L. c. 151B, and stated that, after a further hearing on damages, judgment would enter for the plaintiffs on their MEPA claims. He concluded that the plaintiffs' charges had been timely filed with the MCAD, and that the school district had engaged in wage discrimination in violation of G. L. c. 149, § 105A, by failing to give the plaintiffs credit for their prior work experience in a manner that was comparable to the way in which male teachers had been given credit for prior work experience. The judge subsequently awarded damages in the amount of $60,370 to Silvestris, damages in the amount of $115,811.44 to Goncalves, and attorney's fees and costs in the amount of $42,893.08.[3]

The school district appealed from the judgment in favor of the plaintiffs on their MEPA claims, including the allowance of liquidated damages and the assessment of legal fees, and the cases were transferred from the Appeals Court on our own motion.[4] The school district now contends that (1) the plaintiffs' MEPA claims were barred by the statute of limitations; (2) the judge's findings that the plaintiffs were paid less than their

[3]The judge initially awarded damages in the amount of $30,185 to Silvestris, and damages in the amount of $57,905.72 to Goncalves. However, the judge then allowed the plaintiffs' motion to amend the judgment to allow them to recover liquidated damages in accordance with G. L. c. 149, § 105A ("Any employer who violates any provision of this section shall be liable to the employee or employees affected in the amount of their unpaid wages, and in an additional equal amount of liquidated damages"). As such, the judge issued an amended judgment awarding the plaintiffs damages in the amounts of $60,370 and $115,811.44, respectively.

[4]We acknowledge the amicus briefs filed by Associated Industries of Massachusetts, the Massachusetts Chapter of the National Employment Lawyers Association, and the Attorney General.

male colleagues for prior experience were clearly erroneous; (3) the judge erred in calculating the plaintiffs' damages by awarding back pay to their dates of hire, rather than limiting back pay to the six months preceding the filing of their MCAD charges and by using the maximum salary level when calculating their back pay; and (4) the judge erred in calculating the amount of attorney's fees by failing to take into consideration the fact that the school district prevailed on two of the plaintiffs' three claims, and by failing to deduct allegedly vague, duplicative, and unreasonable fees. For the reasons that follow, we now vacate the judgment in favor of the plaintiffs on their wage discrimination claims and direct the entry of judgment for the school district on those claims.

1. *Statutory framework.* General Laws c. 149, § 105A, states, in pertinent part:

> "No employer shall discriminate in any way in the payment of wages as between the sexes, or pay any person in his employ salary or wage rates less than the rates paid to employees of the opposite sex for work of like or comparable character or work on like or comparable operations; provided, however, that variations in rates of pay shall not be prohibited when based upon a difference in seniority. Any employer who violates any provision of this section shall be liable to the employee or employees affected in the amount of their unpaid wages, and in an additional equal amount of liquidated damages."

The purpose of this statute is "to remedy pay inequities between male and female employees in comparable positions." *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 497 (1995), *S.C.*, 427 Mass. 603 (1998).

2. *Factual background.* Teacher salaries at Tantasqua are governed by the provisions of a collective bargaining agreement (agreement).[5] The agreement states, in relevant part: "Initial salary levels of teachers new to the [school district] shall be set by the [s]uperintendent in accordance with existing salary schedules." The superintendent assigns each new teacher a level

---

[5]The terms of a collective bargaining agreement cannot override the provisions of G. L. c. 149, § 105A. See G. L. c. 150E, § 7.

and year designation from the salary schedule set forth in an appendix to the agreement, which is based on a matrix reflecting educational achievement and years of experience. Level I covers one through three years of experience, Level II covers four through nine years of experience, and Level III covers ten and more years of experience. A teacher would progress through the levels in increments equal to the number of years taught. For example, the designation "Level I, Year 1" would signify that a teacher was in his or her first year of teaching, whereas the designation "Level II, Year 5" would signify that a teacher was in his or her fifth year of teaching. While an entry-level teacher could expect to reach the maximum salary category of "Level III" in ten years, a new teacher who began at a higher level (due to prior experience) could expect to reach the maximum salary category sooner, depending on the level and year designation assigned by the superintendent.

In June, 1993, Silvestris applied for a newly created position at Tantasqua as an allied health teacher in the technical division. The job was designed to prepare students for careers in nursing. Silvestris had experience in this field prior to applying for the Tantasqua position. In 1972, she received an associate's degree in nursing from Springfield Technical Community College, passed the State licensing examination, and became a registered nurse. For the next six years, Silvestris worked as a nurse at Holyoke Hospital and provided instruction to student nurses.[6] In 1980, she took a position with the Westover Job Corps, where she taught students in the nursing assistants program and coordinated job-related training for students already under the direction of employers. In 1986, Silvestris began a new job at Holyoke Community College as a job developer, working with business leaders to establish employment opportunities for business, computer science, and secretarial science students. Silvestris remained at Holyoke Community College for two years. During this same time period, she attended Westfield State College, from which she received a bachelor of science degree in occupational education in 1991. Silvestris also obtained a vocational teaching certificate in the field of allied health.

[6]Before becoming a registered nurse in 1972, Silvestris had worked for three years at Holyoke Hospital as a licensed practical nurse.

After interviewing for the position at Tantasqua in June, 1993, with the director of its technical division, Silvestris met with the superintendent, David Roach, to discuss her educational background, her prior work experience, and her salary. According to Silvestris, the superintendent said that she would receive credit for her teaching time at the Westover Job Corps because it involved the nursing assistants program and because the students there were generally the same age as high school students. However, she would not get credit for her time at Holyoke Community College because that was postsecondary experience. Further, according to Silvestris, the superintendent told her that the school district did not give credit for prior work experience "in the trade."

On July 19, 1993, the superintendent notified Silvestris that she would be hired for the 1993-1994 school year, that she would be placed in the "vocational certificate plus bachelor's degree" education category, and that her starting salary would be established at "Level II, Year 6."[7] This meant that she was given credit for five years of experience. Silvestris accepted a contract with the school district. At the time she was hired, there were six male teachers and no female teachers in the technical division, and she had the highest starting salary of any teacher who had been hired for the technical division to that point in time. Silvestris's ongoing job responsibilities were essentially the same as those of her male colleagues, although she was charged initially with the task of developing the allied health program for the freshmen and sophomore classes and securing its certification by the Department of Public Health and the Department of Education.[8] In 1997, Silvestris reached

---

[7] The position for which Silvestris was hired was 80 per cent of a full-time job during the 1993-1994 school year because it was a newly created position. She accepted this arrangement. In subsequent school years, Silvestris worked 100 per cent of a full-time position.

[8] Other teachers, including male teachers, who were hired to begin new programs in the technical division were also charged with the task of getting their respective programs certified by the State. Teachers who are hired to develop new programs have fewer classroom or student-and-teacher connections. They spend the majority of their time during the school day writing the new curriculum. Once the program has been certified, those teachers then do more teaching than program development.

"Level III" status, the highest classification, and she has remained in that salary category.

In June, 1995, Goncalves applied for a position at Tantasqua as an allied health teacher in the technical division. Like Silvestris, she had experience in the field of nursing prior to applying for this position. In 1975, she received a bachelor of science degree in nursing from Fitchburg State College, passed the State licensing examination, and became a registered nurse. For the next four years, Goncalves worked as a nurse at Ludlow Hospital. In 1979, she took a position as a registered nurse at Mercy Hospital in Springfield where she provided direct patient care and supervised nursing students. In 1984, Goncalves began a new job working as a nurse in a private medical office. She left private practice in 1994 and joined the staff of the Hampden County house of correction, where her duties included providing patient care and performing health screenings for newly admitted inmates. In addition, Goncalves taught, for one year, at the Lower Pioneer Valley Educational Collaborative, where she prepared students for certification as nursing assistants and home health aides. Goncalves also obtained a vocational teaching certificate in the field of nursing.

After interviewing for the position at Tantasqua with both the outgoing and incoming directors of its technical division, Goncalves met with the superintendent, Rosemary Joseph, to discuss her educational background, her prior work experience, and her salary. According to Goncalves, the superintendent initially told her that she would not be given credit for her prior work experience and, therefore, would be offered a salary commensurate with that of an entry-level teacher. Goncalves did not accept this offer. Subsequently, the outgoing technical director notified Goncalves that she would be hired for the 1995-1996 school year,[9] that she would be placed in the "bachelor's degree" education category,[10] and that her starting salary would be established at "Level II, Year 4." This meant that she was given

---

[9]The position for which Goncalves was hired was 80 per cent of a full-time job during the 1995-1996 school year because it was a newly created position. She accepted this arrangement. In subsequent school years, Goncalves worked 100 per cent of a full-time position.

[10]It appears that Goncalves erroneously was not given credit for having a provisional vocational certificate when she was hired in the summer of 1995,

credit for three years of experience. Goncalves accepted a contract with the school district. At the time Goncalves was hired, Silvestris was the only other female teacher in the technical division. Goncalves's ongoing job responsibilities were essentially the same as those of her male colleagues, although she initially was charged with the task of developing the new allied health program for the junior and senior classes and securing its certification by the Department of Public Health and the Department of Education. In 2001, Goncalves reached "Level III" status, and she has remained in that salary category.

In August, 1998, the school district hired Gary Manuel as a technology teacher at Tantasqua for the 1998-1999 school year. He had four years of prior teaching experience at a public middle school and eighteen years of work experience as a general contractor. Manuel was placed in the "master's degree plus 30" education category, and his starting salary was established at "Level II, Year 8." Around this time, the plaintiffs spoke with their male colleagues in the technical division, including Manuel, about whether their years of trade experience had been credited toward teaching experience, thereby enabling them to start at higher salaries. Based on these conversations, the plaintiffs came to believe that, when they were hired, they were started at lower salary levels than male colleagues with purportedly comparable backgrounds. Consequently, on September 22, 1998, the plaintiffs wrote a letter to the president of the Tantasqua Teachers' Association (association) expressing their concern that they had been subjected to sexual discrimination when their initial pay grades were established.[11] In particular, they asserted that when they were hired, there was no

and that she did not bring this error to the school district's attention until some time during the late fall of the 1996-1997 school year. Goncalves had signed teacher contracts for the 1995-1996 and 1996-1997 school years that included this error. The error was corrected in her contract for the 1997-1998 school year, and Goncalves was bumped up to the "vocational certificate plus bachelor's degree" education category. According to the superintendent, neither the Tantasqua Teachers' Association nor Goncalves requested that the school district bring the matter of retroactive compensation before the school committee of the Tantasqua regional school district for an affirmative vote. Goncalves received her full vocational certificate in June, 1998.

[11]Although the plaintiffs did not view their September 22, 1998, letter as a grievance, it was treated as such by the school district.

mention of their prior work experience counting toward teaching experience.

After receiving the September 22, 1998, letter, the association scheduled a "Level Two" grievance hearing with the superintendent, the purpose of which was to hear the plaintiffs' complaint and their proposed remedy.[12] At this point, the plaintiffs did not know the starting salaries of the other teachers in the technical division, their levels of educational achievement, or their prior work experience. The grievance hearing was held in November, 1998,[13] and was attended by the plaintiffs, a representative from the association, a representative from the Massachusetts Teachers Association, the superintendent, and the school district's legal counsel. According to the superintendent, the plaintiffs declined to proceed with the hearing when they learned of the presence of the school district's legal counsel. The association subsequently requested from the superintendent, on several occasions, the personnel records of all of the teachers in the school district. In May, 1999, the plaintiffs received a document listing the names of nine teachers in the technical division (including themselves), their degree statuses, their positions, their dates of hire, their level and year designations, and their starting salaries.[14] Once they had this specific information, the plaintiffs commenced the present actions.

3. *Statute of limitations.* The school district first contends that the judge erred in failing to conclude that the plaintiffs' MEPA claims were barred by the applicable statute of limitations. It asserts that the plaintiffs were required to file their complaints with the MCAD within six months of the alleged discriminatory act. See G. L. c. 151B, § 5. However, the plaintiffs did not file their charges with the MCAD until July 14, 1999, which, ac-

---

[12]According to the terms of the 1997-2000 collective bargaining agreement, a "grievance" was defined as "a complaint, a violation, misinterpretation, or inequitable application of any of the provisions of [the] contract." A "Level Two" grievance proceeding meant that the matter had been referred to the superintendent for review and disposition.

[13]The exact date of this grievance hearing is not set forth in the record.

[14]Neither the exact date the plaintiffs received this document nor the reason for the delay in its distribution is set forth in the record. The document was dated April 23, 1999. The plaintiffs testified that they received it sometime in May, 1999. For our purposes here, it makes no difference whether the plaintiffs received it in April or May, 1999.

cording to the school district, was too late. The school district further contends that the judge erred in determining that the trigger for the statute of limitations was April, 1999,[15] when the plaintiffs' suspicions of discrimination were confirmed by documentary evidence as to the starting salaries of teachers in the technical division. Relying on *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521 (2001), the school district asserts that the trigger for the statute of limitations should have been the date that the plaintiffs were aware, or reasonably should have been aware, of the alleged discriminatory action. In the school district's opinion, the plaintiffs knew of their claims in September, 1998, when they spoke to their male colleagues about their starting salaries and, then, when they wrote a letter to the association expressing their concerns. Thus, the school district argues that it was in September, 1998, that the statute of limitations began to run on the plaintiffs' claims, and their charges should have been filed with the MCAD by March, 1999.

The plaintiffs agree with the school district, as do we, that the governing statute of limitations was six months.[16] When they filed their charges with the MCAD, the plaintiffs alleged that the school district had discriminated against them in violation of both G. L. c. 151B and G. L. c. 149, § 105A, by failing to pay them in a manner that was comparable to their male colleagues. Accordingly, the plaintiffs' claims fell within the purview of the statute of limitations set forth in c. 151B. General Laws c. 151B, § 5, requires that a complaint alleging wrongful conduct be filed with the MCAD within six months after the alleged act of discrimination.[17] See *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 531; *School Comm. of Brockton* v.

---

[15]See note 14, *supra.*

[16]MEPA has its own one-year statute of limitations for actions alleging the discriminatory payment of wages based on sex. General Laws c. 149, § 105A, states that "[a]ny action based upon or arising under [§§ 105A - 105C], inclusive, shall be instituted within one year after the date of the alleged violation." Because the applicability of this statute of limitations to the plaintiffs' claims was not raised before the judge, we deem it waived. See *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 347 (1996); *Kagan* v. *Levenson*, 334 Mass. 100, 106 (1956).

[17]In 2002, the limitations period under G. L. c. 151B, § 5, was extended from six months to 300 days. See St. 2002, c. 223, § 1.

*Massachusetts Comm'n Against Discrimination*, 423 Mass. 7, 10 (1996); *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 497-498 (1995). The filing of a timely charge of discrimination with the MCAD is a prerequisite to the filing of such an action in the Superior Court. See *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 531 n.11; *Andrews* v. *Arkwright Mut. Ins. Co.*, 423 Mass. 1021 (1996); *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 583-584 (1994).

With these general principles in mind, we now consider when the alleged discriminatory acts occurred, and when the plaintiffs knew that they had been harmed, so as to determine when the six-month statute of limitations began to run on their claims. When a cause of action accrues for purposes of the statute of limitations has not been defined by the Legislature but has been the subject of judicial interpretation in this Commonwealth. See *Riley* v. *Presnell*, 409 Mass. 239, 243 (1991); *Franklin* v. *Albert*, 381 Mass. 611, 617 (1980). As a general rule, tort actions accrue at the time the plaintiff is injured. See *Joseph A. Fortin Constr., Inc.* v. *Massachusetts Hous. Fin. Agency*, 392 Mass. 440, 442 (1984); *Cannon* v. *Sears, Roebuck & Co.*, 374 Mass. 739, 741 (1978). The unfairness of such a rule, however, has been recognized in actions where the wrong is "inherently unknowable." See *Mohr* v. *Commonwealth*, 421 Mass. 147, 155 (1995); *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983). Accordingly, pursuant to the so-called "discovery rule," the statute of limitations for a particular cause of action does not begin to run until the plaintiff knows, or should have known, that she has been harmed by the defendant's conduct. See *Wheatley* v. *American Tel. & Tel. Co.*, 418 Mass. 394, 398 (1994) (limitations period does not begin to run in discrimination action until plaintiff knows or reasonably should know of replacement by younger employee). See also *Albrecht* v. *Clifford*, 436 Mass. 706, 714-715 (2002); *Franklin* v. *Albert, supra* at 618-619. "One need not apprehend the full extent or nature of an injury in order for a cause of action to accrue." *Riley* v. *Presnell, supra* at 243.

Once a defendant raises the statute of limitations as an affirmative defense and establishes that the action was brought more than six months from the date of the injury, the burden of

proving facts that take the case outside the statute of limitations falls to the plaintiff. See *id.* at 243-244. In most instances, the question when a plaintiff knew or should have known of the existence of a cause of action is one of fact that will be decided by the trier of fact. See *id.* at 247-248, and cases cited. See also *Lindsay* v. *Romano*, 427 Mass. 771, 774 (1998). The appropriate standard to be applied when assessing knowledge or notice is that of a "reasonable person in the plaintiff's position." *Riley* v. *Presnell, supra* at 245. See *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 208-210 (1990).

Here, the school district properly raised the statute of limitations as an affirmative defense in its answers to the plaintiffs' complaints. It demonstrated that any alleged discrimination suffered by Silvestris first would have occurred during the 1993-1994 school year when she received paychecks pursuant to her initial contract with the school district that would have reflected a lower starting salary than the starting salaries received by male colleagues who purportedly had been given more credit for prior work experience when they were hired. Cf. *LeGoff* v. *Trustees of Boston Univ.*, 23 F. Supp. 2d 120, 126 (D. Mass. 1998) (Equal Pay Act, 29 U.S.C. § 206 [d], "violated each time an employee receives a lower paycheck because of her sex"). Similarly, any alleged discrimination suffered by Goncalves first would have occurred during the 1995-1996 school year when she received paychecks pursuant to her initial contract with the school district that would have reflected a lower starting salary than the starting salaries received by male colleagues. When the plaintiffs filed their complaints with the MCAD on July 14, 1999, it plainly was more that six months from the dates of the alleged unlawful acts. The burden of proof then shifted to the plaintiffs to establish facts that would take their action outside this six-month statute of limitations. See *Riley* v. *Presnell, supra* at 243-244.

The plaintiffs testified that prior to the fall of 1998, they had no knowledge of the starting salaries of the other teachers in the technical division, their levels of educational achievement, or their prior work experience. The plaintiffs would have had no reason to request such statistics, and nothing in the record suggests that specific salary data for individual teachers in the

school district (as opposed to the generic salary matrix set forth in the agreement) was public information. It was not until the school district hired Gary Manuel for the 1998-1999 school year and established his starting salary at "Level II, Year 8" that the plaintiffs began to suspect discriminatory payment of wages. That suspicion triggered conversations with their male colleagues about whether they had received credit for their years of prior work experience, thereby enabling them to start at various higher salaries than entry-level teachers. Based solely on these conversations, the plaintiffs came to believe that, when they were hired, they unlawfully were given less credit for their prior work experience than male teachers.

The judge found that the plaintiffs knew that they had been harmed by the school district's conduct in April, 1999, when they received documentary evidence supporting their suspicions about salary disparities. However, based on the letter that the plaintiffs wrote to the association on September 22, 1998,[18] we conclude that they had ascertained sufficient information at that point to believe that they, as women, had been subjected to discriminatory treatment by the school district when the superintendent established their starting salaries. Accordingly, September 22, 1998, was the date when the plaintiffs had reason to know that they had been harmed by the school district's conduct, and when the six-month statute of limitations began to run on their claims.

The plaintiffs advocate for application of the so-called continuing violation doctrine to their claims alleging inequitable payment of wages in violation of G. L. c. 149, § 105A. Such doctrine heretofore has been applied in this Commonwealth as a limited exception to the six-month statute of limitations for discrimination claims, usually those premised on a hostile work

---

[18]In their letter to the association, the plaintiffs stated as follows: "It has been brought to our attention that several of our male co-workers, upon being hired, were given their years of industrial service as credit towards teaching experience. This automatically placed them at a much higher salary level than a new teacher, even though many of them did not hold a bachelor's degree or full certification. We understand that technical education has to offer an incentive in order to secure licensed trades people. However, when we were hired, there was no mention of industrial experience being used in place of our teaching experience. For this reason, we feel that we were sexually discriminated against during our hirings."

environment.[19] See *Clifton* v. *Massachusetts Bay Transp. Auth.*, 445 Mass. 611, 616-617 (2005); *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 540 (2001). Cf. *Ocean Spray Cranberries, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 642-643 (2004). "This exception for violations of a continuing nature 'recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact.' " *Id.* at 642, quoting *Cuddyer* v. *Stop & Shop Supermarket Co.*, supra at 531. See *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 115 (2002) (recognizing that essence of hostile work environment claim is repeated conduct, not separate and distinct acts). This totality of events approach is not pertinent to an unequal compensation claim under G. L. c. 149, § 105A, which is based on discrete acts. An alleged inequality can be identified on examination of individual paychecks, rather than on the evaluation of ongoing wrongful conduct. See, e.g., *Pollis* v. *New Sch. for Social Research*, 132 F.3d 115, 119 (2d Cir. 1997) ("a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action").

Further, as a general proposition, expanding the continuing violation doctrine beyond discrimination claims brought under G. L. c. 151B to unequal wage claims brought under G. L. c. 149, § 105A, would eviscerate the one-year statute of limitations set forth in § 105A. See note 16, *supra*. See also *Ocean Spray Cranberries, Inc.* v. *Massachusetts Comm'n Against Discrimination*, supra at 645 (discrete discriminatory act triggers statute of limitations). For these reasons, we decline to expand the continuing violation doctrine to unequal wage claims under G. L. c. 149, § 105A. "Because pay claims do give rise to a

[19]This exception to the six-month statute of limitations, see G. L. c. 151B, § 5, provided that "[t]he complaint may be filed . . . at any time within six months after the alleged unlawful conduct; provided, however, that the six month requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature . . . ." 804 Code Mass. Regs. § 1.10(2) (1999). See note 17, *supra*.

cause of action each time they occur and are easily identifiable, it is not unreasonable to expect a plaintiff to file a charge of discrimination within the limitations period, *so long as [the plaintiff] is aware of the discrimination"* (emphasis added). *Inglis v. Buena Vista Univ.*, 235 F. Supp. 2d 1009, 1028 (N.D. Iowa 2002). Cf. *National R.R. Passenger Corp.* v. *Morgan, supra* at 105, 113 (recognizing viability of equitable principles, such as discovery rule, to toll time period for filing charge of discrimination under Title VII of Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.). The continuing violation doctrine does not operate to extend the limitations period in the present case.

The matter, however, does not end there. The MCAD's rules of procedure state, inter alia, that "the six month requirement shall not be a bar to filing in those instances . . . when pursuant to an employment contract, an aggrieved person enters into grievance proceedings concerning the alleged discriminatory act(s) within six months of the conduct complained of and subsequently files a complaint within six months of the outcome of such proceeding(s)." 804 Code Mass. Regs. § 1.10(2) (1999).[20] Here, the statute of limitations was tolled when the plaintiffs sent their letter to the association and it was treated as a grievance by the school district. The school district has not shown that the filing of the plaintiffs' complaints with the MCAD was untimely under 804 Code Mass. Regs. § 1.10(2).[21] Accordingly, the school district's reliance on the statute of limitations as an affirmative defense is unavailing.

4. *Wage discrimination.* The school district contends that the judge's findings that the male teachers were given more credit for previous work experience than the plaintiffs, thereby allowing male teachers to start at higher salaries, were clearly erroneous. Therefore, the school district continues, the plaintiffs were not entitled to prevail on their claims under G. L. c. 149, § 105A. We agree.

---

[20]In 2004, the six-month filing requirement was extended to 300 days. See 804 Code Mass. Regs. § 1.10(2) (2004).

[21]To the extent that the school district and the superintendent may not have adhered to the grievance procedure set forth in Art. II of the agreement by completing grievance proceedings in a timely manner, that fact does not inure to the benefit of the school district.

In reviewing the judge's decision, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Mass. R. Civ. P. 52 (a). See *Kendall* v. *Selvaggio*, 413 Mass. 619, 620 (1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 792 (1986), quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). "[T]o ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio, supra* at 621.

The plain language of G. L. c. 149, § 105A, allows for variations in rates of pay based on "seniority" and demonstrates the Legislature's recognition that employers may offer different levels of compensation based on the prior experience of their prospective employees. See G. L. c. 149, § 105A. At Tantasqua, seniority is established when the superintendent assigns each new teacher a level and a year designation as set forth on the salary matrix in the agreement. The issue here is whether the plaintiffs were subjected to wage discrimination because, when they were hired for the technical division, they were given less credit for prior work experience than male teachers and, consequently, over the years, their salaries continued to be below those of their male colleagues until the salaries for both male and female teachers equaled out when they all reached the highest category, "Level III." This case does not present the issue whether, once they were hired, male and female teachers in the technical division were doing "work of like or comparable character." G. L. c. 149, § 105A.

Pursuant to the terms of the 1994-1997 agreement, which was in effect at the time Silvestris and Goncalves were hired,[22] "[i]nitial salary levels of teachers new to the [school district] [would] be set by the [s]uperintendent in accordance with exist-

---

[22]While Silvestris was hired during the summer of 1993, and the 1994-1997 agreement was dated March 15, 1994, it nonetheless included the school district's teachers' salary schedule for the 1993-1994 school year.

ing salary schedules." In addition, "[p]revious experience and hours of graduate credit [would] be evaluated in relationship to the position being filled." The agreement did not specify how "[p]revious experience," whether it be teaching experience or time the applicant spent working in a particular profession, should be qualitatively evaluated, or how credit for any such experience should be allocated in determining a new teacher's initial salary level. The absence of such specific language suggests that it was within the discretion of the superintendent, who presumably had the most experience in this area, to make those judgment determinations.

Much has been made of the deposition testimony of Rosemary Joseph, the school district's superintendent beginning in 1995, in which she stated that her "rule of thumb" in hiring was to give "two years of experience for one year of teaching," meaning that two years of prior work experience would be credited as one year of prior teaching experience in order to increase a new teacher's starting salary. However, she also stated in her deposition, and then at trial, that she looked at work experience "all things being equal," which included consideration of the applicant's performance during the interview, the type of position being filled, the quality of the other candidates, and budgetary constraints. Notwithstanding the superintendent's articulation of her general "rule of thumb," the record demonstrates that it was not used in any clear or consistent way to establish initial teacher salaries, either for men or women. The superintendent acknowledged as much in her testimony.

The judge rightly found, and we agree, that there was no clearly defined and articulated standard for how much credit a new teacher would be given for prior work experience. However, the judge's related finding that male teachers were given more credit for prior work experience than the plaintiffs was clearly erroneous. Based on a close review of the record, we conclude that the evidence did not support a finding that the superintendent's conduct had a disproportionately discriminatory impact on women. The plaintiffs' starting salaries were not determined in a manner that violated G. L. c. 149, § 105A.

When Stephen McGuiness and Alfred Errede were hired in 1975 to teach industrial arts in the technical division, neither

had any prior teaching or work experience. Accordingly, each was assigned a salary category of "Level I, Year 1."

When Maurice Bracken and Donald Manseau were hired in 1984 to teach electrical work, neither had any prior teaching experience.[23] The superintendent testified that Bracken had six and one-half years of prior work experience,[24] for which he was given three years of credit and assigned a salary category of "Level II, Year 4." Manseau had thirteen years of prior work experience, for which he was also given three years of credit and assigned a salary category of "Level II, Year 4." When Raymond Rousseau was hired in 1989 to teach machine shop, he had no prior teaching experience and nine years of prior work experience. Like Bracken and Manseau, he was given three years of credit and assigned a salary category of "Level II, Year 4." When Lawrence LaBelle was hired in 1990 to teach drafting, he had no prior teaching experience and seventeen years of prior work experience. Similarly, he was given three years of credit and assigned a salary category of "Level II, Year 4." The data support a conclusion that credit for prior work experience was allocated in an unspecified manner, and that not all prior experience was treated equally. When Bracken, Manseau, Rousseau, and LaBelle applied for positions in the technical division, none had any prior teaching experience, and their years of prior work experience varied widely from six and one-half years to seventeen years. Yet, each was assigned the same salary category of "Level II, Year 4."

When Silvestris was hired in 1993 to teach allied health, she was given five years of credit and assigned a salary category of "Level II, Year 6," higher than any of the male teachers hired before her. She testified that she had been told by the superintendent that she would be given credit for her prior experience at the Westover Job Corps (which would count as

---

[23]Notwithstanding the superintendent's testimony that, to her knowledge, Donald Manseau had no prior teaching experience, his resume indicated that, at the time he applied for a position at Tantasqua, he was teaching electrical work at Bay Path Vocational Technical High School. It does not appear that he was given credit for this teaching experience.

[24]Based on Maurice Bracken's resume, it appears that the four and one-half years he was the owner and operator of Maurice A. Bracken Electric was not counted as "prior work experience."

"teaching" experience), but not for her prior experience at Holyoke Community College. Silvestris further testified that, in response to her inquiry about credit for her prior nursing experience, the superintendent explained to her that the school district did not give credit for work experience "in the trade." However, the evidence does not demonstrate that the school district actually applied this purported policy. David Roach, the superintendent who hired Silvestris, testified that the job for which Silvestris applied had been budgeted as a "Level I, Year 1" position because it was new. He also stated that, before he interviewed Silvestris, he was aware that she had no public school teaching experience.[25] Notwithstanding Silvestris's understanding of how she would be given credit for prior teaching and work experience, Roach testified that she was ultimately extended a job offer at "Level II, Year 6" based on a "totality of experience" that led the school district to conclude that Silvestris was "the person for the job." The testimony of the superintendent did not pinpoint to what extent Silvestris was given credit for prior teaching experience versus prior work experience. What is clear is that she was given five years of credit for some combination of approximately fourteen years of prior teaching and work experience. When compared with the male teachers who had been hired before her, the evidence does not support a conclusion that Silvestris was subjected to wage discrimination based on gender.

The same is true with respect to Goncalves. When she was hired in 1995 to teach allied health, she was given three years of credit and assigned a salary category of "Level II, Year 4." Like Silvestris, Goncalves testified that, in response to her inquiry about credit for her prior nursing experience, the superintendent told her that the school district "did not do that." However, the evidence again does not demonstrate that the school district actually applied this purported policy. Rosemary Joseph, the superintendent who hired Goncalves,

---

[25]David Roach did not testify about how the school district evaluated "teaching" experience for purposes of setting initial salary levels. However, Rosemary Joseph stated that prior public school teaching experience was weighed more favorably than other types of teaching experience because it was easier to assess the prior public school teaching experience and compare it with the new teacher's responsibilities at Tantasqua.

testified that Goncalves's starting salary was based on a "combination of factors" — teaching experience *and* comparable prior work experience. The teaching experience was one year that Goncalves had spent at the Lower Pioneer Valley Educational Collaborative in a part-time position. The superintendent testified that the prior work experience for which Goncalves was given credit was the time that Goncalves had spent at Ludlow Hospital and Mercy Hospital (eight years), and not the time that she had spent working for a private medical practice or at the Hampden County correctional center because, in the superintendent's judgment, those two latter jobs were not applicable to the type of work that Goncalves would be doing at Tantasqua. Thus, notwithstanding Goncalves's understanding that the school district did not give credit for work experience "in the trade," she actually did receive such credit. The fact that she was not given credit for *all* of her prior nursing experience was based on the superintendent's considered judgment that not all of Goncalves's experience was relevant and applicable to teaching high school students. Similar determinations appear to have been made with respect to the male teachers hired before her given that their years of prior work experience varied widely and yet each was assigned the same starting salary category. The evidence does not support a conclusion that Goncalves was subjected to wage discrimination based on gender.

A brief review of the school district's hiring practices after the plaintiffs accepted their positions at Tantasqua bolsters our conclusions that credit for prior work experience was allocated in an unspecified manner (not using a "rule of thumb" of "two years of experience for one year of teaching"), and that such allocation did not have a disproportionately discriminatory impact on women. When Valida Pendleton was hired in 1997 to teach allied health, she had no prior teaching experience or comparable work experience.[26] Accordingly, she was assigned a salary category of "Level I, Year 1." Tanya Bullock was hired that

[26]Based on her resume, it appears that Valida Pendleton worked for the Department of Mental Retardation for seven and one-half years. The superintendent testified that Pendleton received no credit for this experience because her position had been that of an "aide," which was not comparable to being a teacher.

same year to teach computer science and had no prior teaching experience. However, she did have three years of prior computer experience, for which she was given three years of credit and assigned a salary category of "Level II, Year 4." Bullock, a woman, was the only teacher who was given the same number of years of credit for starting salary purposes as she had actual years of prior work experience.

When Timothy Seguin was hired in 1997 to teach carpentry, he had no prior teaching experience and fourteen years of prior work experience. He was given four years of credit and assigned a salary category of "Level II, Year 5," which was one step above Goncalves and one step below Silvestris. Michael Napieralski was hired in 1997 to teach carpentry and had no prior teaching experience.[27] However, he did have over twenty years of prior work experience as a carpenter, for which he was given seven years of credit and assigned a salary category of "Level II, Year 8." Napieralski was the first teacher to be hired for a position in the technical division at a starting salary above both plaintiffs, a reflection of the fact that he had at least six more years of comparable prior work experience than Silvestris, and twelve more years than Goncalves. When Gary Manuel was hired in 1998 to teach technology, he had four years of prior teaching experience at a public middle school, and eighteen years of prior work experience as a general contractor. Like Napieralski, he was given seven years of credit (four years for his teaching experience, and three years for his work experience), and was assigned a salary category of "Level II, Year 8." The difference between Manuel's starting salary and those of the plaintiffs was primarily attributable to the fact that he had substantially more prior public school teaching experience than the plaintiffs, thereby elevating the amount of credit he received.[28]

In sum, although the discretion conferred on the superinten-

[27]Notwithstanding the superintendent's testimony that, to her knowledge, Michael Napieralski had no prior teaching experience, his resume indicates that he had worked as a substitute teacher in the carpentry program at Bay Path Vocational Technical High School.

[28]When the plaintiffs filed their original charges with the MCAD on July 14, 1999, their allegations of discrimination were based on an examination of the salaries of those male teachers who had been hired up until that point in

dent under the 1994-1997 agreement to set the initial salary levels of new teachers was exercised without any well-defined and articulated criteria, we conclude that the resulting lack of uniformity in starting salaries did not establish that the plaintiffs were subjected to wage discrimination based on gender in violation of G. L. c. 149, § 105A.

5. *Conclusion.* The judgment in favor of the plaintiffs on their wage discrimination claims is vacated, and a new judgment shall enter in favor of the school district on those claims.[29]

*So ordered.*

---

time. Accordingly, we need not analyze salary information pertaining to three male teachers (George Zini, Martin Drexhage, and Franco Dell'Olio) who were hired for the technical division after the filing of the plaintiffs' charges.

[29]In light of our disposition of these cases, we need not address the issue of damages or the plaintiffs' request for reasonable appellate attorney's fees and costs. See generally *Yorke Mgt.* v. *Castro*, 406 Mass. 17 (1989).