HENRY, J.
In this employment discrimination action, Priscilla Flint appeals from a summary judgment entered in favor of the defendants. The principal question presented is whether the plaintiff's administrative complaint was timely. After a careful review of the record, we conclude that the question of timeliness cannot be decided as a matter of law. Accordingly, we reverse the summary judgment on the pay discrimination claim. However, we agree that summary judgment was properly granted to the defendants on Flint's constructive discharge claim and on her breach of contract claim.
1. Background. We summarize the undisputed facts drawn from the summary judgment record; to the extent the record includes disputed evidence, we consider that evidence in the light most favorable to Flint, against whom summary judgment entered. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680, 46 N.E.3d 24 (2016). We focus first on allegations relating to the timeliness of Flint's claims.
In August, 1997, the city of Boston (city) hired Flint, a black woman, as a payroll accountant in the treasury department. For the duration of Flint's employment, Vivian Leo, who is white, held the position of first-assistant treasurer-collector. By the end of 1997, Flint was promoted to senior accountant and received a substantial pay raise. Flint was supervised by Marissa Sheehan. When Sheehan departed for a two-year special assignment in July, 1998, Flint accepted an offer from Leo to assume Sheehan's position as payroll supervisor. This was a position at the pay grade of middle management 8 (MM-8), and Flint assumed management of four staff members.[2] Flint also began performing *422 work for the Boston Teachers' Retirement Fund Association (teachers' fund), and receiving an accompanying stipend for these services.
In 2008, Leo decided to merge the payroll and general services departments. Leo informed Flint that when the general services supervisor, Judy Cataldo, retired, she wanted Flint to manage both departments. When Flint hesitated, Leo stated, "You will be getting a raise ... this is a promotion for you." Leo indicated that Flint would be upgraded to an MM-9 position, which paid an additional $5,000 to $10,000 per year and that the "raise would happen soon."[3] Flint accepted the offer and began working in her new role on October 1, 2008.
The newly created position substantially increased Flint's workload and added three staff members under her supervision for a total of seven. Leo believed that Flint was entitled to the MM-9 pay rate, retroactive to when Flint assumed the position.
Leo called two meetings to announce Flint's promotion. At a general staff meeting, when an employee questioned why the job had not been posted, Leo responded that she did not have to post it. At a second meeting, Leo informed the managers that she wanted to quell rumors questioning whether Flint had been promoted; Leo stated that Flint was promoted and "that was that."
On two or three occasions in the winter and spring of 2009, Leo assured Flint that she was "working on" the raise and that Flint would get it. When asked about the delay, Leo explained that "they were doing something with the budget." Flint trusted Leo "to do what she said she would do" because she had promoted Flint twice before and each time Flint received a pay raise. Flint understood that Leo had to clear the raise through Lisa Signori, the city's chief financial officer and the collector-treasurer, as well as through the city's human resources department (HR). Flint "did not want to go over [Leo's] head" to speak with Signori because, at the time, she had a "very good working relationship" with Leo, and "could almost call [Leo] my friend."
Flint next approached Leo on October 1, 2009, stating, "I need my raise. You promised me a raise. When am I going to get my raise?" Leo replied that they needed "to wait until the elections are over. There is [sic ] going to be some new changes." Flint indicated that was "okay," but repeated that she wanted her raise, and Leo reiterated that Flint was "going to get it." Around this time, Flint also spoke to Vivian Leonard, the city's HR director. Leonard encouraged Flint to "hang in there," stating that she was "going to get the raise."[4]
After two more promises of a forthcoming raise by Leo in December, 2009, and the spring of 2010 that never came to fruition, Flint then went out on an extended medical leave for her second knee replacement. Upon Flint's return to work on July 15, 2010, Leo informed Flint that she was not getting a raise, stating, "There is no money in the budget. No one is getting *423 a raise .... There is nothing I can do. Go talk to Lisa Signori." Flint did attempt to speak with Signori the next day, but was advised that Signori was leaving the treasury.
Flint also learned in July, 2010, that the teachers' fund work and accompanying stipend had been discontinued during her medical leave. Leo denied having a part in the removal, initially informing Flint that the stipend had been taken away from the treasury department. When Flint questioned Leo further, Leo stated that the board of trustees of the teachers' fund had voted to pay Sheehan for the services instead of Flint. However, the payroll supervisor for the Boston public school department informed Flint that Leo sent a letter asking that the work and accompanying stipend be taken away from Flint and given to Sheehan.[5] Flint confronted Leo, who stated that she wrote the letter because Flint was out on medical leave and was therefore unable to do the work. Flint never received the work and stipend back.
After Leo told Flint she would not be getting a raise, Flint met with John Zuccaro, the union president, and attempted to file a grievance over the pay raise denial. Zuccaro told her she was two years too late, adding in conversation that he had known Leo for thirty years and had gone to school with her.[6]
On August 26, 2010, Flint submitted a compensation grade appeal to her union pursuant to the collective bargaining agreement (CBA) between the city and the union.[7] The city's office of labor relations date-stamped the appeal as received. Leonard, a signatory to the CBA on behalf of the city, subsequently told Flint that her "compensation appeal will probably go through."[8]
On December 31, 2010, Flint, age fifty-six, retired nine years earlier than planned. She subsequently checked the *424 status of her compensation grade appeal with the union to see if it was "dead in the water." In March, 2011, a union representative told Flint that, because she had filed the appeal before leaving her employment, she would receive a hearing. Flint never heard anything further about the compensation grade appeal. The parties agree that the appeal was never decided. Flint did not ask her union to file and advance a grievance on her behalf against the city for failing to act on her pay grade appeal. Flint filed her Massachusetts Commission Against Discrimination (MCAD) complaint on September 19, 2011, and her Superior Court complaint on March 5, 2012.
2. Standard of review. "In considering a motion for summary judgment, we review the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. The defendants, as the moving parties, have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 395, 50 N.E.3d 778 (2016), quoting Drakopoulos v. United States Bank Nat'l Ass'n, 465 Mass. 775, 777, 991 N.E.2d 1086 (2013). We review the decision to grant summary judgment de novo. See Bulwer, 473 Mass. at 680, 46 N.E.3d 24.
3. Discussion. a. Pay discrimination claim. i. Statute of limitations. Any person claiming a violation of G. L. c. 151B must file an administrative complaint "within 300 days after the alleged act of discrimination." G. L. c. 151B, § 5. Absent a timely MCAD complaint, a plaintiff is barred from filing a Superior Court action under G. L. c. 151B, § 9. See Christo v. Edward G. Boyle Ins. Agency, Inc., 402 Mass. 815, 816, 525 N.E.2d 643 (1988). The statute of limitations is subject to principles of waiver, estoppel, and equitable tolling. See Everett v. 357 Corp., 453 Mass. 585, 600 n.21, 904 N.E.2d 733 (2009). Here, the main discriminatory act alleged by Flint was the city's failure to increase her pay grade. Flint knew or should have known that she had been harmed no later than July 15, 2010, when Leo told her she would not be getting a raise. See Silvestris v. Tantasqua Regional Sch. Dist., 446 Mass. 756, 766, 847 N.E.2d 328 (2006). The time for Flint to file expired on May 11, 2011, unless there was an equitable reason for the deadline to toll. We conclude that factual and legal bases exist that would allow a trier of fact to conclude that Flint's complaint was timely.
The Legislature empowered the MCAD to promulgate regulations "suitable to carry out the provisions of this chapter, and the [MCAD's] policies and practice[s]." G. L. c. 151B, § 3 (5). See Rock v. Massachusetts Comm'n Against Discrimination, 384 Mass. 198, 205-208, 424 N.E.2d 244 (1981). The MCAD has provided an exception to the 300-day filing requirement in cases involving grievances.[9] See 804 Code Mass. Regs. § 1.10(2) (2018). The regulation has the force of law. See Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 496, 930 N.E.2d 1262 (2010). The strictures of the regulation must be interpreted liberally, consistent with the remedial purposes of our antidiscrimination statute. See *425 Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination, 91 Mass. App. Ct. 208, 214 n.7, 73 N.E.3d 333 (2017).
Flint was a union member covered by a CBA. Aggrieved by the city's failure to increase her pay, she entered into a proceeding "pursuant to an employment contract" in an attempt to resolve the disputed pay matter with her employer.[10] See 804 Code Mass. Regs. § 1.10(2). Although the appeal was not a grievance as defined by the CBA, if Flint received a negative result, it could have ripened into a grievance. Flint's initiation of a process that, with an adverse outcome, could have resulted in a grievance falls within the regulation's scope.[11] This construction of the regulation furthers the courts' policy of favoring internal resolution of discrimination claims over costly litigation,[12] see Cuddyer v. Stop & Shop Supermkt. Co., 434 Mass. 521, 538, 750 N.E.2d 928 (2001), as well as the legislative directive that "G. L. c. 151B 'shall be construed liberally for the accomplishment of its purposes.' " Gannon v. Boston, 476 Mass. 786, 793, 73 N.E.3d 748 (2017), quoting G. L. c. 151B, § 9.
ii. Application of 804 Code Mass. Regs. § 1.10(2). The MCAD's grievance tolling regulation has two 300-day limitation periods. The plaintiff must enter into a grievance proceeding "within 300 days of the conduct complained of" and subsequently file an MCAD complaint "within 300 days of the outcome of such proceeding(s)." 804 Code Mass. Regs. § 1.10(2). We conclude that in this case genuine issues of material fact are presented with respect to both limitation periods. For example, a jury could find that Flint reasonably relied on Leo's repeated assurances of a raise and that Flint's claim therefore did not accrue until July 15, 2010, when Leo told her definitively that she would not receive a raise. In this scenario, the compensation grade appeal would be timely and, because it could have ripened into a grievance, would operate to toll the limitations period for the duration of those proceedings. See Martins v. University of Mass. Med. Sch., 75 Mass. App. Ct. 623, 628-629, 915 N.E.2d 1096 (2009). Alternatively, a jury could find that Flint's claim accrued earlier.
As for the compensation grade appeal, the parties agree that it was not decided. We agree that, at some point, no person in Flint's position could have reasonably continued to believe the appeal was still open. However, given the assurances of Leonard and the union after Flint filed the compensation grade appeal, the city has not shown, as a matter of law, that Flint's September 11, 2011, MCAD complaint was filed more than 300 days after the "outcome"
*426 of her appeal, and was thus untimely. Certainly, an employer's failure to timely complete an internal remedial process cannot inure to its benefit. See Silvestris, 446 Mass. at 770, 847 N.E.2d 328.[13]
iii. Equitable tolling. In the alternative, we conclude that, even if 804 Code Mass. Regs. § 1.10(2) is inapplicable, there is a genuine issue of material fact for the jury regarding the availability of equitable tolling or equitable estoppel. See Andrews v. Arkwright Mut. Ins. Co., 423 Mass. 1021, 1022, 673 N.E.2d 40 (1996) ("Equitable tolling is available in circumstances in which the plaintiff is excusably ignorant about the [300 day] filing period ... or where the defendant or the MCAD has affirmatively misled the plaintiff"); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 446, 671 N.E.2d 510 (1996) ("a statute of limitations may be tolled ... by reason of the employer having caused the employee to delay acting, i.e., an equitable estoppel ..."); Cherella v. Phoenix Techs., Ltd., 32 Mass. App. Ct. 919, 920, 586 N.E.2d 29 (1992) (where defendant "encourages or cajoles the potential plaintiff into inaction, that conduct may be a basis of extending the limitations period as matter of equity"). Reading the facts in the light most favorable to Flint, until July 15, 2010, Leo assured Flint that she would be getting her raise. In addition, after Flint filed her compensation grade appeal, Leonard, the city's HR director, told Flint that her compensation grade appeal would "probably go through." Leonard certainly was in a position to know the status of the appeal (or so it would seem to Flint). On this separate legal theory, we conclude that factual bases exist that would allow a trier of fact to conclude that Flint's complaint was timely.
iv. Burden-shifting paradigm. Because the judge dismissed Flint's discrimination claim as time-barred, he did not reach the merits of that claim, which have been fully briefed and argued on appeal. We turn to the familiar construct used to test the pay discrimination claim's worthiness for trial. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ; Verdrager, 474 Mass. at 396-397, 50 N.E.3d 778. Our review of the evidentiary record convinces us that the defendants failed to satisfy their summary judgment burden in this case. See Bulwer, 473 Mass. at 683, 46 N.E.3d 24, quoting Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39, 825 N.E.2d 522 (2005) ("[T]he burden of persuasion at summary judgment remains with the defendants, 'who, as the moving part[ies], ha[ve] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [they] would not have the burden on an issue if the case were to go to trial' ").
The defendants did not challenge Flint's prima facie showing below, as they do here, and so we do not consider the first stage further. As Flint does not challenge the defendants' satisfaction of their second-stage burden of production "to articulat[e] a legitimate, nondiscriminatory reason for" not offering the promised raise, we proceed to the third stage of the analysis, where "the burden of production shifts back to the employee to produce evidence that '[the city's] articulated justification [for the adverse action] is not true but a pretext.' " Verdrager, 474 Mass. at 397, 50 N.E.3d 778, quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441, 443, 646 N.E.2d 111 (1995).
*427 Between 2008 and 2010, the main reason the city provided to Flint for the failure to increase her pay grade was alleged budgetary problems. However, a fact finder could reasonably infer that the budget was not the real reason for the lack of a pay raise. First, when Cataldo retired on September 30, 2008, her $75,000 to $80,000 salary was budgeted for the entire fiscal year, and was thus available and sufficient to cover Flint's promised pay raise. Further, by 2010, many employees were no longer working at the treasury, creating a budget surplus that potentially could have been used to cover a pay raise for Flint. Indeed, shortly before Leo's July 15, 2010, announcement that no one was getting a raise, Leo authorized a pay increase for Chinele Velazquez, a Hispanic woman.[14] There was also evidence that during the time period Leo was "working on" Flint's raise, other white and Hispanic employees received pay raises, including Richard DiPiano, who was promoted to second-assistant collector-treasurer in 2010, Vincent Vina, and Sheehan.[15]
On appeal, the defendants claim that Flint's salary upgrade was part of a division-wide reorganization plan that Signori, the "sole" decision maker, rejected due to budget constraints. A jury could reasonably find that this proffered reason for Flint's treatment was not true. First, there was sufficient money in the budget for raises, and employees who were not black received raises. Second, the only evidence of an alleged reorganization involving multiple individuals was insufficient to meet the defendants' summary judgment burden of demonstrating the absence of any genuine issue of material fact on every relevant issue. No copy of Leo's written proposal is included in the summary judgment record. The undated department organizational chart, which postdates Flint's employment, was inadequate to establish which employees were included in the alleged reorganization. While the defendants claim that Flint was treated equally to the other employees who were also denied raises, the defendants have not named the other employees who did not get pay raises allegedly proposed by Leo (although they have listed their races in their brief: "six white, two black"). The defendants admit that the only "reorganization" done by Leo involved Flint assuming additional duties and staff. Weakness or implausibility in the reason proffered by the defendants creates a dispute of material fact because it permits a finding of pretext. See Bulwer, 473 Mass. at 684, 46 N.E.3d 24.
b. Constructive discharge. Flint's constructive discharge theory is that the failure to promote her to an MM-9 position was a constructive discharge. She relies solely on the "demotion and other loss of authority or status" line of cases identified in *428 Rubin v. Household Commercial Fin. Servs., Inc., 51 Mass. App. Ct. 432, 441-445, 746 N.E.2d 1018 (2001).[16] Under the demotion line of constructive discharge cases, courts have found constructive discharge "if the employer effectively [gives] the employee's job to someone else[;] ... transferred the employee's responsibilities leaving him without any authority; ... or reassigned the employee to a nonexistent job." Id. at 446, 746 N.E.2d 1018. Nothing of the sort occurred here. Following the public announcement of her promotion, Flint received additional responsibilities. Her authority was increased. Leo's July, 2010, announcement that Flint was not getting the pay grade raise cannot be viewed conceptually as a "demotion" that compelled her to retire. For this reason, summary judgment was properly entered on this claim.
c. Breach of contract. "[W]e may consider any ground apparent on the record" that upholds a motion judge's ruling. Feeney v. Dell Inc., 454 Mass. 192, 211, 908 N.E.2d 753 (2009). Flint's common law contract claim fails as matter of law based upon her failure to fully exhaust her contractual remedies under the CBA. One exception to the exhaustion doctrine permits a direct action against an employer that "repudiates" or "nullifies" the "grievance machinery" of a CBA. Balsavich v. Local Union 170 of the Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 371 Mass. 283, 286, 356 N.E.2d 1217 (1976). Here, it is undisputed that Flint did not ask her union to file and advance a grievance on her behalf against the city for failing to act on her pay grade claim. She thus cannot show conduct by the city amounting to a repudiation or nullification of the CBA's procedures. See Ramirez-Lebron v. International Shipping Agency, Inc., 593 F.3d 124, 132 (1st Cir. 2010) (in Labor Management Relations Act cases, Federal courts overlook absence of full exhaustion on three occasions "because circumstances have impugned the integrity of the arbitration process").
To the extent that the union may have wrongfully declined to pursue the appeal, Flint did not bring a breach of the duty of fair representation claim against her union in the first instance before the Department of Labor Relations as required by Massachusetts law. See Johnston v. School Comm. of Watertown, 404 Mass. 23, 25-27, 533 N.E.2d 1310 (1989) ; Leahy v. Local 1526, Am. Fed'n of State, County & Mun. Employees, 399 Mass. 341, 349-351, 504 N.E.2d 602 (1987). For these reasons, summary judgment in favor of the defendants was properly entered on the breach of contract claim.
4. Conclusion. So much of the judgment dismissing Flint's constructive discharge claim and breach of contract claim is affirmed. So much of the judgment dismissing Flint's pay discrimination claim is vacated, and the matter is remanded to the Superior Court for further proceedings consistent with this decision.
So ordered.

This "temporary" job was not posted, and Leo did not require Flint to apply for it. Sheehan returned to work in another position at the department.

Flint asked Leo about Kempton "Monty" Flemming, a long-term and more experienced employee who was "by right" next in line for Cataldo's position. Flemming is a black man. Leo told Flint that Flemming was not interested in the job. However, Flemming later informed Flint that he would have taken the position if Leo had offered it to him.

Flint understood from conversations with Leo and Leonard that Leo was attempting to upgrade the salaries of everyone in the merged department. However, the only "reorganization" actually implemented involved Flint's position.

Sheehan is white. Leo is friends with Sheehan and is the godmother of Sheehan's oldest child.

Article X of the collective bargaining agreement (CBA) specifies that a grievance is waived unless filed within ten days "from the date of occurrence of the event upon which the grievance is based or from the date when the grievant has or should have had knowledge of the event upon which the grievance is based" (emphasis added). Zuccaro did not apprise Flint about this portion of the grievance arbitration clause. Cf. United Steelworkers of Am. v. Commonwealth Employment Relations Bd., 74 Mass. App. Ct. 656, 664-665, 909 N.E.2d 1177 (2009). We note that when the defendants quoted article X in their brief, they elided the underlined text.

The CBA defines the compensation grade appeal process separately from the grievance procedure. Article XXXIIV [sic] of the CBA (hereinafter, Article XXXIII) governs compensation grade appeals. The provision requires (1) the creation of a joint compensation grade appeal committee (joint committee) consisting of up to two city designees and two union designees; (2) periodic meetings by the joint committee to review claims by the union that certain positions should receive a compensation upgrade; and (3) a nonbinding recommendation from the committee to the city at the completion of its review. The provision states that "[t]he [u]nion has the right to file and advance a grievance filed over the outcome of" the compensation grade appeal, in conformance with the grievance procedure. The provision further states that "in no event shall such grievance be subject to arbitration without the written agreement of the [c]ity of Boston's [o]ffice of [l]abor [r]elations" except that if "the [c]ommittee unanimously recommends an upgrade, written agreement from the [o]ffice of [l]abor [r]elations shall not be withheld."

Significantly, the motion judge failed to view the facts in the light most favorable to Flint on this critical point. Specifically, the motion judge stated, "Nothing in the summary judgment record suggests that anyone at the [c]ity ... gave Flint any indication after July of 2010 that the raise might still be approved."

The regulation provides, in relevant part, "[t]he complaint may be filed ... by delivering it ... to any of the [MCAD]'s offices at any time within 300 days after the alleged unlawful conduct; provided, however, that the 300 day requirement shall not be a bar to filing in those instances ... when pursuant to an employment contract, an aggrieved person enters into grievance proceedings concerning the alleged discriminatory act(s) within 300 days of the conduct complained of and subsequently files a complaint within 300 days of the outcome of such proceeding(s)." 804 Code Mass. Regs. § 1.10(2) (2018).

Not every employee complaint submitted to an employer will be covered by the grievance tolling exception. The MCAD has interpreted the clause as applying only to cases involving a formal grievance process arising under a CBA. See Shervin v. Partners Healthcare Sys., Inc., 2 F.Supp.3d 50, 62-64 (D. Mass. 2014), aff'd, 804 F.3d 23, 38-39 (1st Cir. 2015) ; Hall v. FMR Corp., 559 F.Supp.2d 120, 125-126 (D. Mass. 2008). Given the formality of the process here, our interpretation is consistent with this limitation.

To the extent that the defendants contend that the compensation grade appeal was procedurally defective and not viable, that defense, raised for the first time on appeal and lacking evidentiary support, is not properly before us. See Martins v. University of Mass. Med. Sch., 75 Mass. App. Ct. 623, 633 n.16, 915 N.E.2d 1096 (2009).

We note that our construction of the regulation also is consistent with the intent of the parties to favor informal resolution of claims. Specifically, the introductory section of article X of the CBA provides that "[i]t is the intent of the parties to this agreement to use their best efforts to encourage the informal and prompt settlement of grievances that may arise between the [u]nion or a member or members of the bargaining unit and the [c]ity."

Given our view of the case, we have no need to address Flint's alternative timeliness theories.

In October, 2009, Flint spoke to Velazquez, one of her subordinates, about work-related issues such as Velazquez's failure to complete assignments, her daily tardiness, and her overuse of the Internet and her Blackberry cellular device. In response, Leo demanded that Flint apologize to Velazquez. Following the apology, Velazquez no longer respected Flint's authority.

There was further evidence of Leo's disparate treatment of black employees, which also support Flint's allegations of pay discrimination. Flint offered evidence that between 2009 and 2010, Leo selectively enforced the treasury's tardiness policy in favor of white and Hispanic employees. When another black employee claimed race discrimination, Leo responded, "What about Priscilla? She is a black person." Leo forced Flint to attend the MCAD hearing with her on that employee's second complaint against Leo, stating, "I have you. You're black."

Flint does not advance the traditional theory of constructive discharge based on intolerable working conditions. See GTE Prods. Corp. v. Stewart, 421 Mass. 22, 33-35, 653 N.E.2d 161 (1995).