UNITED STEELWORKERS OF AMERICA *vs.* COMMONWEALTH
EMPLOYMENT RELATIONS BOARD.[1]

No. 08-P-814.

Suffolk. April 2, 2009. - July 20, 2009.

Present: LENK, KANTROWITZ, & WOLOHOJIAN, JJ.

*Commonwealth Employment Relations Board. Labor,* Fair representation by union.

A plaintiff appealing from a decision of the Commonwealth Employment Relations Board (board) was precluded from arguing that the board's decision was based on insufficient evidence, where the plaintiff did not provide a complete transcript of the hearing; therefore, this court's review was limited to determining whether the board's decision was marred by legal error or was otherwise arbitrary, capricious, or an abuse of discretion. [661]

The Commonwealth Employment Relations Board correctly concluded that a union violated its duty of fair representation under G. L. c. 150E, § 10(*b*)(1), through inexcusable neglect when it failed timely to demand arbitration on behalf of a union member, based solely on a union official's mistaken belief that the union member had recourse to full relief under the civil service laws, where the union official's misunderstanding of or disregard for an easily knowable civil service limitations period did not shield the union from its duty to that member. [661-665]

APPEAL from a decision of the Commonwealth Employment Relations Board.

*Alfred Gordon* for the plaintiff.

*Maydad D. Cohen* for the defendant.

WOLOHOJIAN, J. The United Steelworkers of America (union) appeals from a decision of the Commonwealth Employment Relations Board (board) that the union violated its duty of fair representation under G. L. c. 150E, § 10(*b*)(1). On appeal, the union makes two principal arguments. First, it contends that the board's decision was not supported by substantial evidence. Second, the union argues that liability was impermissibly imposed

[1]Formerly the Labor Relations Commission.

based on what it considers a novel per se rule requiring union representatives to advise union members of legal remedies and requirements other than those contained in the collective bargaining agreement (CBA). Because we disagree with both contentions, we affirm.

The union and the city of Springfield (city) were parties to the CBA, which was effective from July 1, 1997, to June 30, 2000. Under art. 8.02 of the CBA, a union member could contest his or her job termination[2] through a four-step grievance process culminating in arbitration.[3] Alternatively, a union member who was also a city employee could appeal his or her termination to the State Civil Service Commission (commission) under G. L. c. 31, § 43.[4] The two avenues of relief could not

---

[2]Article 7.01 of the CBA provided that "[the city] and the Union shall recognize and adhere to all Civil Service and State labor laws, rules and regulations, relative to . . . discharges, removals and suspensions." As a result of this provision, G. L. c. 31, § 41 (which requires the city to show just cause before discharging, removing, or suspending a tenured employee), was incorporated into the CBA.

[3]Article 8.02 of the CBA provided that "[g]rievances shall be processed as follows:

> "*Step 1.* The Union representative with or without the aggrieved employee shall present the grievance orally to the employee's immediate supervisor outside of the bargaining unit, who shall attempt to adjust the grievance informally.
>
> "*Step 2.* If the grievance is not settled at Step 1, it shall be presented in writing to the Department Head within eight (8) calendar days from the date of the presentation at the Step 1 level.
>
> "*Step 3.* If the grievance is not settled within ten (10) calendar days from the date of written presentation at the Step 2 level, the grievance shall be submitted within ten (10) calendar days to the Labor Relations Department of the City.
>
> "*Step 4.* If the grievance is not settled within ten (10) calendar days from date of presentation at the Step 3 level, the Union may submit the grievance to arbitration. Such submission must be made within sixty (60) calendar days after the expiration of the ten (10) calendar days referred to herein.
>
> "Within the aforesaid sixty (60) calendar days period, written notice of said submission must be given to the Employer by delivery in hand, or by mail to the office of the Mayor."

[4]General Laws c. 31, § 43, as amended by St. 1981, c. 767, § 20, provides

both be pursued.[5] Although the union explicitly undertook to represent its members with respect to the CBA's grievance process, it did not undertake (but reserved the right) to represent those members with respect to a civil service appeal.[6]

Each route entailed different deadlines for initiating and pursuing a claim. The grievance process involved a series of deadlines for each progressive step (see note 3, *supra*). A civil service appeal was to be filed within ten days of receiving a decision that there was just cause to terminate the employee (see note 4, *supra*). At the heart of this suit is the fact that the ten-day deadline was missed, and because of a mistaken assumption that the civil service appeal remained timely, the grievance process was not pursued through arbitration. When the error was discovered, it was too late to pursue arbitration, and the employee was left with no timely route for appealing his termination.

*Background.*[7] Mark Muniak was a union employee of the city's department of public works (DPW). On March 6, 2000, the city suspended him for five days based on allegations that he had wilfully destroyed city property and made threatening and intimidating remarks.[8] The city sent two letters to Muniak on that same day: the first informed him of his suspension; the second informed him that the city was contemplating further disciplinary

that "[i]f a person aggrieved by a decision of an appointing authority made pursuant to section forty-one shall, within ten days after receiving written notice of such decision, appeal in writing to the commission, he shall be given a hearing before a member of the commission or some disinterested person designated by the chairman of the commission."

[5]If a union member chose to appeal to the commission, the CBA's "choice of remedies" provision would bar the matter from proceeding to arbitration. Likewise, a civil service appeal was to be dismissed "[i]f the commission determines that such appeal has been previously resolved or litigated with respect to such person, in accordance with the provisions of [a collective bargaining agreement's grievance process], or is presently being resolved in accordance with such [process]." G. L. c. 31, § 43.

[6]Article 8.02 of the CBA provided that "[t]he Union representative with or without the aggrieved employee shall present the grievance," while art. 7.02 provided that "[t]he Union further reserves the right to represent employees under any such [civil service] procedure."

[7]The parties do not challenge any of the board's factual findings.

[8]Muniak was reported to have intentionally put sugar into the gasoline tank of a DPW truck and to have threatened to resolve his issues with management by getting his gun.

action, including termination. Both letters attached copies of sections of G. L. c. 31, the civil service statute, including § 43, which contained the ten-day deadline for filing a civil service appeal.

Immediately after receiving these letters, Muniak telephoned his union representative, George Magnan. Muniak read both letters over the telephone to Magnan (who had not received copies of them from the city). Although both letters referenced the civil service statute, copies of the statutory provisions themselves were included only in the attachments, which Muniak did not read to Magnan.[9] Both letters informed Muniak of his right to request a hearing on the city's contemplated actions. Magnan advised Muniak to request a hearing. He also said that he did not handle civil service matters, although he would attend the hearing. He suggested that Muniak retain an attorney with civil service expertise.

On March 17, 2000, following a hearing, the city found just cause to terminate Muniak's employment effective March 20. On March 18, Muniak telephoned Magnan, who said that he would file a grievance under the CBA's grievance procedure. Muniak, having received and read the sections of the civil service statute previously provided by the city, expressed a preference to pursue the matter instead before the commission. Magnan repeated that he did not handle civil service matters and again suggested that Muniak retain counsel. Muniak asked Magnan about the ten-day period to appeal to the commission. Magnan replied that under the CBA, Muniak did not have to choose between arbitration or civil service until later in the process. Muniak interpreted Magnan's statements to mean that he did not yet have to file an appeal with the commission and could wait to do so until the grievance process had progressed further. This was incorrect; no more than nine days remained for filing a civil service appeal.

Over the next few weeks, Magnan attempted unsuccessfully to resolve the matter through the first and second steps of the grievance process.[10] By April 28, 2000, Magnan had arranged

---

[9]After this conversation, Magnan asked the city to send him copies of all letters relating to Muniak's suspension and termination. At some point before mid-March, 2000, the city sent copies of the letters to Magnan but did not enclose copies of the statutes.

[10]On March 27, 2000, Magnan filed a grievance asserting the city had

with the city to waive step three and proceed to arbitration. After reaching that agreement, Magnan telephoned Muniak, who again asked for union help in appealing to the commission. Magnan reiterated that he did not handle civil service appeals and again advised Muniak to retain an attorney. Magnan stated that if Muniak wished instead to arbitrate, Magnan was willing to represent him and had already prepared the arbitration filing. Muniak replied that he preferred to pursue an appeal to the commission. Muniak's desire in this regard was misplaced, because the ten-day filing deadline had expired approximately one month earlier. Based on Muniak's expressed preference to pursue a civil service appeal, but apparently without making any effort to determine whether a civil service appeal was indeed still viable, Magnan did not file for arbitration and the time period for doing so under the CBA was allowed to expire.[11] See note 3, *supra.* If Magnan had known that the deadline for filing a civil service appeal had expired, he would have instead recommended that Muniak pursue arbitration under the CBA.

On May 2, 2000, Muniak appealed to the commission, which ultimately dismissed his appeal as untimely.

Muniak filed a charge with the board, alleging that the union had committed a breach of its duty of fair representation under G. L. c. 150E, § 10(*b*)(1).[12] The board reasoned that by virtue of having negotiated art. 7 (which specifically incorporated the civil service law into the CBA) and art. 8.08 (which required an employee to elect his route of redress as between the commission and the grievance process), the union had assumed a duty to advise its members correctly about "the procedural interplay between the civil service law and the terms of the [CBA],

unlawfully terminated Muniak's employment. By a letter dated April 4, 2000, the city denied the grievance on the basis that the DPW had just cause to terminate Muniak's employment. Sometime later, the city extended an offer to rehire Muniak (at a lower DPW job title) if he would admit wrongdoing. Muniak refused.

[11]During another conversation in late April, 2000, Magnan encouraged Muniak to pursue a civil service appeal by telling him that "someone in the [u]nion office who was knowledgeable about civil service" said that civil service "was the route to follow in Muniak's discharge."

[12]The board issued a complaint corresponding to Muniak's charge. After an evidentiary hearing, a hearing officer issued recommended findings of fact, which were adopted by the board with supplementation from the record.

particularly the time limits for filing an appeal under the civil service law." The board concluded that the union "acted in a manner reflective of inexcusable neglect by failing to timely and properly notify Muniak about the election of remedies for appealing his termination required by the [CBA]." The union now appeals.

*Sufficiency of the evidence.* The union argues that the board's decision was based on insufficient evidence. That argument, however, is not available to the union because it failed to provide a complete transcript of the hearing. "That a transcript must be submitted to support a claim that the evidence was insufficient is not some hypertechnical requirement, but a reflection of the fact that resolution of such a claim requires the reviewing court to see the entirety of the evidence that was presented." *Covell* v. *Department of Social Servs.*, 439 Mass. 766, 782 (2003). See *Sturdy Memorial Foundation, Inc.* v. *Assessors of N. Attleborough*, 47 Mass. App. Ct. 519, 519 (1999), *S.C.*, 60 Mass. App. Ct. 573 (2004); Mass.R.A.P. 8(b)(1), as amended, 430 Mass. 1603 (1999) (appellant's duty to provide transcript).

Our review, therefore, is limited to determining whether the board's decision is marred by legal error or is otherwise arbitrary, capricious, or an abuse of discretion. G. L. c. 30A, § 14(7). See *Connolly* v. *Suffolk County Sheriff's Dept.*, 62 Mass. App. Ct. 187, 193 (2004) ("unless it is clear that the [board's] ultimate findings are not supported by [its] subsidiary findings . . . review is limited to determining whether error of law occurred"). In addition, we give deference to the board's specialized knowledge in interpreting collective bargaining agreements and applicable statutory provisions. *Anderson* v. *Commonwealth Employment Relations Bd.*, 73 Mass. App. Ct. 908, 910 (2009). See *Children's Hosp. Corp.* v. *Rate Setting Commn.*, 410 Mass. 66, 68-69 (1991) (deference given to agency's interpretation of contract); *Everett* v. *Local 1656, Intl. Assn. of Firefighters*, 411 Mass. 361, 368 (1991) (interpretation of collective bargaining agreements is board's "traditional role, as to which it possesses special expertise"). Applying those principles, we next turn to the union's argument that, as matter of law, the board incorrectly found a duty where none exists.

*The duty of fair representation.* Pointing specifically to the

following passage from the board's decision, the union contends that the board imposed a per se obligation on union representatives to be knowledgeable about legal requirements and procedures beyond those contained in the CBA, in effect requiring union representatives to become legal experts on civil service laws:

> "Once the Union negotiated and incorporated the language in both Article 7 *Civil Service* and Article 8.08 *Choice of Remedy* into the Agreement, the Union voluntarily assumed the duty to notify bargaining unit members about the procedural interplay between the civil service law and the terms of the Agreement, particularly the time limits for filing an appeal under the civil service law."

The union argues that this is a novel, per se obligation that conflicts with the broad latitude, discretion, and "fairly generous scope for inaction" it is permitted without committing a breach of the duty of fair representation.[13] *National Assn. of Govt. Employees* v. *Labor Relations Commn.*, 38 Mass. App. Ct. 611, 613 (1995).

We need not and do not address the question whether the terms of the CBA alone sufficed to create a duty to inform Muniak of the civil service filing deadlines. This is not that case. Instead, as shown by the extensive, detailed factual findings of the board, there were several additional bases on which to impose a duty and find its breach. See *National Assn. of Govt. Employees, Local R1-162* v. *Labor Relations Commn.*, 17 Mass. App. Ct. 542, 543 (1984) (affirming board's decision on separate ground).

The union hired Magnan in 1998 as a staff representative.

---

[13] "A union has a duty to represent its members fairly in connection with issues that arise under a collective bargaining unit." *Goncalves* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 289, 293 (1997), quoting from *National Assn. of Govt. Employees* v. *Labor Relations Commn.*, 38 Mass. App. Ct. 611, 613 (1995). "Unions are permitted 'a wide range of reasonableness' in representing the often-conflicting interests of employees; hence, unions are vested with considerable discretion not to pursue a grievance, as long as their actions are 'not improperly motivated, arbitrary, perfunctory or demonstrative of inexcusable neglect.' " *Ibid.*, quoting from *Graham* v. *Quincy Food Serv. Employees Assn. & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 606 (1990). See *National Assn. of Govt. Employees* v. *Labor Relations Commn.*, *supra* (union commits breach of duty if its actions toward member are discriminatory, arbitrary, in bad faith, grossly inattentive, or grossly negligent).

Among his other union duties, Magnan negotiated and administered collective bargaining agreements for both public and private sector employees. Magnan was hired having no training or experience in dealing with the Massachusetts civil service laws. The union did not remedy this deficiency after Magnan was hired, although it provided training on other substantive topics. The union made its legal staff available to answer questions; Magnan, however, did not consult that staff concerning Muniak's termination case.

During virtually every conversation, Muniak told Magnan that he wanted to pursue an appeal to the commission. Equally consistently, Magnan responded that he would not represent Muniak in the civil service process. Their conversations, however, extended beyond these narrow exchanges. When Muniak received the two letters dated March 6, he read them to Magnan, including their references to the State civil service statute. Magnan, who had not received the letters, took it upon himself to request that the city send them to him, which it did. However, Magnan thereafter apparently made no effort to determine what, if any, implications the civil service statute might have for Muniak's case.

Knowing nothing about the civil service statute or about its applicable deadlines, having made no effort to rectify that ignorance, and knowing that Muniak's preferred route of redress was civil service, not the grievance process, on March 18 (while Muniak's civil service claim could still be timely filed), Magnan incorrectly and affirmatively advised Muniak that he could defer filing his civil service claim in favor of the grievance process. Once Magnan voluntarily chose to give advice on the subject of the interplay between the civil service deadlines and the terms of the CBA, he had an obligation to know what he was talking about. "Although ordinary negligence may not amount to a denial of fair representation, lack of a rational basis for a union decision and egregious unfairness or reckless omissions or disregard for an individual employee's rights may have that effect." *Goncalves* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 289, 294 (1997), quoting from *Trinque* v. *Mount Wachusett Community College Faculty Assn.*, 14 Mass. App. Ct. 191, 199 (1982). While union officials are not required "to make any complex legal interpretation [or] exhibit reasoning akin to that of the commission or of a

judge," a union is not shielded from liability solely because its officials are mistaken about readily recognizable issues that arise during representation. *Goncalves* v. *Labor Relations Commn.*, *supra* at 298 (as matter of law, union not shielded by union official's ignorance of union's policies).

This breach of the duty of fair representation arguably deprived Muniak only of his preferred choice of forum by causing him to defer filing an appeal with the commission until it was too late. However, this first breach was compounded by a second, more harmful one. At least a month after the civil service deadline had passed, Magnan and Muniak spoke about whether to elect arbitration, the final step in the CBA's grievance process. Magnan knew that the choices were mutually exclusive; under the CBA, electing a civil service appeal would preclude pursuing arbitration. He advised Muniak to pursue the civil service appeal[14] and did not file an arbitration demand, allowing the deadline to lapse. He did so wilfully ignorant of the applicable deadlines, having made no effort to determine whether Muniak had a viable civil service claim at that time, and without consulting the union's legal staff. He conceded that, had he known that the civil service appeal deadline had passed, he would not have advised Muniak to file such an appeal rather than to pursue arbitration. Where Magnan knew that Muniak wanted to appeal his termination, and given their several conversations, Magnan had an obligation to take reasonable steps to assure himself that Muniak had a viable civil service appeal before he abandoned the grievance process by failing to file an arbitration demand.

These facts must be taken in conjunction with the terms of the CBA, which incorporate the requirements of the civil service statute and provide for a procedural interplay between the CBA's grievance process and that statute. Taking all the circumstances together, the board's determination that the union had committed a breach of its duty of fair representation through inexcusable neglect was not marred by legal error, nor was it otherwise arbitrary, capricious, or an abuse of discretion. G. L. c. 30A, § 14(7). As the board properly determined, the union's failure to demand

---

[14]Magnan also assured Muniak that a knowledgeable union official, who was familiar with the case, had concluded that civil service was the "route to follow."

arbitration was "based solely on a Union official's mistaken belief that Muniak had recourse to full relief under the civil service law." That Magnan misunderstood or disregarded the easily-knowable civil service limitation period does not shield the union from its duty to its members. See *Goncalves* v. *Labor Relations Commn., supra* at 298.

> *Decision of the Commonwealth Employment Relations Board affirmed.*