# United States Court of Appeals

## For the First Circuit

No. 08-2321

ROBERTO RAMÍREZ-LEBRÓN; FÉLIX FERNÁNDEZ-TORRES;
VÍCTOR APONTE-TORRES; JESÚS CASTRO-GELY;
RAMÓN MATTA-FLORES; DAVID DE JESÚS-ORTÍZ;
JOSÉ J. GONZÁLEZ-CENTENO,

Plaintiffs, Appellants,

v.

INTERNATIONAL SHIPPING AGENCY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Baldock,* and Lipez, Circuit Judges.

Juan H. Saavedra Castro for appellants.
Antonio Cuevas Delgado for appellee.

January 29, 2010

---

* Of the Tenth Circuit, sitting by designation.

**BALDOCK**, **Circuit Judge**. This appeal arises out of a labor dispute over seniority rights between two groups of employees of Defendant International Shipping Agency (ISA). The two groups consist of three and seven employees respectively (G3 and G7). The ten total employees, all employed as "checkers," are members of the Unión de Empleados de Muelles de Puerto Rico (AFL-CIO), Local 1901 I.L.A. (Union). G7 filed a verified complaint pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, alleging that ISA and G3 fraudulently procured, in breach of the collective bargaining agreement (CBA), an arbitration award granting seniority rights to G3. Neither the Union nor G7 was a party to the agreement between ISA and G3 that presaged the award. As alleged, the Union, prior to the award, notified both ISA and the arbitrator that the Union objected to any resolution of the matter absent its participation as exclusive bargaining representative for all ten member employees. G7 asked the district court to (1) vacate the arbitration award in favor of G3, (2) order an arbitration hearing at which the Union and G7 would be provided a meaningful opportunity to be heard, and (3) render damages against ISA. The district court dismissed G7's complaint. According to the court, G7 lacked standing to request a vacatur of the arbitration award and failed to exhaust its contractual remedies under

- 2 -

the CBA's grievance procedure.

We exercise jurisdiction under 28 U.S.C. § 1291.  Our review of a Rule 12(b) dismissal is de novo.  See McCloskey v. Mueller, 446 F.3d 262, 265-66 (1st Cir. 2006).  Accepting all well pleaded factual allegations of the complaint as true, we conclude the district court erroneously dismissed G7's complaint.  Those factual allegations are sufficient under § 301 to establish G7's standing and sustain G7's claim that ISA, by entering into a side agreement with G3 designed to procure an arbitration award, breached the CBA and effectively repudiated its arbitration provisions, thereby estopping ISA from posing the defense of exhaustion. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

## I.

G7's complaint alleges as follows:  In April 2002, ISA and the Union agreed that G7, whose members were part of the Union, would have seniority rights over G3.  G3's members joined the Union in May 2002.  In February 2003, the Union, at the request of G3, filed a grievance pursuant to the CBA with the Puerto Rico Bureau of Conciliation and Arbitration (Bureau) challenging the seniority rights of G7. G7 thereafter demanded that the Union allow its seven members to intervene in the arbitration of G3's grievance.

- 3 -

The Union agreed and "informed the Bureau and ISA in writing that the [G7 members] would be joined as parties to the grievance because they could be 'affected by any determination of the grievance and that they had a right to participate' in the process."

In March 2007, the Union, through its President, sent a letter to ISA (with a copy to the arbitrator previously selected through the Bureau) stating the Union was "not in agreement" with any "arrangements" regarding seniority rights that ISA might make with G3 (or G7 for that matter). Rather, the Union expressed its view that "there is no arrangement whatsoever until the arbitrator hears both parties and issues his Award." On August 27, 2007, a hearing before the arbitrator, at which ISA, the Union, G3, and G7 were set to appear, was suspended. That same day, the Union, again through its President, sent a letter to the arbitrator stating the Union did not recognize any agreement ISA and G3 may have reached concerning the seniority rights of G3 in relation to those of G7. The letter further stated that the Union:

> [H]ad a hearing today which was suspended since Atty. Gonzalez Vargas [G3's attorney] and the attorney from the company [ISA's attorney] requested that it [G3's grievance] be heard by record, which was never requested from this Union for its approval and we found out through you and I reiterate that this Union is totally opposed.

> Three days prior to the scheduled hearing, ISA and G3

- 4 -

allegedly had "reached a secret agreement on the seniority issue and submitted their agreement to the arbitrator." Under the agreement, "ISA and [G3] agreed to amend the 2002 Seniority List Agreement to allow [G3] to move up the list and bump and acquire seniority rights over [G7]." The arbitrator issued an award on April 3, 2008, incorporating what G7's complaint refers to as a "sham, secret agreement." According to the complaint:

> ISA and [G3] submitted their secret agreement to the Bureau under false and fraudulent pretenses. ISA intentionally mischaracterized this agreement to suggest the Union and ISA had reached the agreement. ISA knew that the Union had not approved the agreement and that the Union required a hearing on the seniority grievance, with the presence of [G3] and [G7]. ISA also knew that the Union rejected any attempt to settle the seniority issue with [G3].

G7 also averred that ISA induced the arbitrator "to issue an arbitration award based on a ruse and fraudulent scheme, and the sham, secret agreement." Based upon the foregoing allegations, G7's complaint claimed that ISA had breached the CBA and repudiated the arbitration process. As its prayer for relief, G7 asked the court to vacate the arbitrator's award and render a declaratory judgment under 28 U.S.C. § 2201 "that any challenge or dispute relating to the 2002 Seniority List must be resolved with the presence and participation of [G7] and [G3], in accordance with the terms and conditions established by the Board of Directors of the Union." G7 further sought an award of damages

- 5 -

"including emotional and mental distress injuries suffered, and any wages and compensation losses caused," based on ISA's breach of the CBA "and/or the implied covenant of good faith and fair dealing incorporated into the CBA."

ISA initially moved to dismiss G7's complaint on the basis that the latter's claim to seniority rights was subject to arbitration under the CBA.[1] The district court, however, read G7's complaint as one to set aside an arbitration award. Relying on Section 5 of the Federal Arbitration Act (FAA), specifically 9 U.S.C. § 10(a)(1), which empowers a court "upon the application of any party to the arbitration" to vacate an award "procured by corruption, fraud, or undue means," the court held G7's allegations of fraud on the part of ISA sufficient to withstand the motion.

ISA subsequently filed a motion to reconsider which the district court construed pursuant to Fed. R. Civ. P. 60(b) as one for relief from judgment based on a manifest error of law. This time, the district court reasoned G7 was not a party to the CBA or the arbitration proceeding. Rather, ISA

---

[1] We are left to ponder why neither G7 nor ISA, whose respective theories of the case depend on the terms of the CBA, have never entered the CBA into the record. On the limited record before us, we accept G7's uncontroverted allegations that the Union is the exclusive bargaining representative of its member employees, and ISA and the Union agreed that disputes over seniority rights were subject to the CBA's grievance procedures.

and the Union were the only proper parties thereto. Thus, the district court concluded G7 lacked standing to challenge the arbitration award. According to the court, G7 would have standing to challenge the award only if the complaint had alleged ISA breached the CBA <u>and</u> the Union breached its duty of fair representation. The court held that G7's failure to allege wrongdoing on the part of the Union sounded the death knell of its challenge to the arbitration award. The district court further concluded the CBA required G7 to submit its members' breach of contract claim to arbitration because the CBA contained a provision requiring the arbitration of grievances involving seniority rights.

## II.

We need not address whether the district court in holding that G7 lacked "standing" to maintain this action properly characterized G7 as a "non-party" to the arbitration within the meaning of Section 5 of the FAA. Certainly, the named parties to the arbitration as reflected in the challenged award's caption were ISA and the Union.[2]

---

[2] That the arbitrator's written award in favor of G3's seniority rights is not a part of the record in this case defies explanation. We may, however, under Fed. R. Evid. 201 take judicial notice of the official English translation of that award as it appears of record in <u>Unión de Empleados de Muelles de Puerto Rico v. Int'l Shipping Agency Inc.</u>, No. 08-cv-01615-ADC, ISA's Motion Submitting Certified Translations (D.P.R.,

- 7 -

This necessarily follows from the fact that ISA and the Union are the named parties to the CBA. As the exclusive bargaining representative of its member employees under the terms of the CBA, the Union submitted G3's grievance over seniority rights to ISA. But G7's action is not one to vacate an arbitration award under Section 5 of the FAA. Rather, G7 asserts a cause of action under Section 301 of the LMRA for breach of the CBA. Though somewhat inartfully pled, the remedies G7 seeks for that breach are a declaration of contractual rights, vacatur, and damages.

Section 301 provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a). Despite Section 301's plain reference to contracts between employers

_____

filed July 2, 2008) (Docket Entry #11). In that case, the Union filed a petition in Puerto Rico commonwealth court seeking to set aside the arbitration award for the reasons that the arbitrator (1) acted without jurisdiction in the absence of the Union's consent; (2) condoned the improper conduct of ISA and G3; and (3) denied both the Union and G7 due process of law. See Unión de Empleados de Muelles de Puerto Rico v. Int'l Shipping Agency, No. KAC08-0643 (507), Petition for Review of Arbitration Award (Court of First Instance, Superior Part of San Juan, filed May 2, 2008). The Union's petition apparently again is pending in commonwealth court after ISA's attempt to remove the action to federal district court proved unsuccessful.

and unions, the Supreme Court in <u>Hines</u> v. <u>Anchor Motor Freight, Inc.</u>, 424 U.S. 554, 562 (1976), recognized that "Section 301 contemplates suits by and against individual employees as well as between unions and employers; and contrary to earlier indications § 301 suits encompass those seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, [and] overtime pay." <u>Hines</u> suggests Section 301 is broad enough to encompass G7's action against ISA for breach of the CBA, viewed as the first step in its effort to vindicate its purported right to seniority status vis-a-vis G3. See <u>Tejidos de Coamo, Inc.</u> v. <u>Int'l Ladies Garment Workers' Union</u>, 22 F.3d 8, 15 (1st Cir. 1994) (recognizing that a Section 301 action may request a declaration of contractual rights pursuant to Section 2201); <u>Black-Clawson Co.</u> v. <u>Int'l Ass'n of Machinists</u>, 313 F.2d 179, 181-82 (2d Cir. 1962) (holding Section 301 is not restricted to suits for damages or specific enforcement and will sustain a request for a declaratory judgment).

Despite loose reference to the "standing" label in some court opinions addressing employee claims under Section 301, the overriding issue here is not whether G7 has standing. Rather, as we shall see, the issue is whether G7 has alleged circumstances sufficient to sustain a cause of action for breach of the CBA against ISA under Section 301. G7 undoubtedly has standing because its members have alleged a

"uniquely personal" stake in the outcome of the controversy necessary to sustain federal jurisdiction under Section 301. "To establish standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." Horne v. Flores, 129 S. Ct. 2579, 2592 (2009). More particularly, in the context of Section 301:

> [T]he determination whether an individual employee has standing to seek enforcement of a right . . . granted under the [CBA] turns upon the nature of the right . . . at issue, the test being whether the right . . . sought to be enforced is 'uniquely personal' to the individual plaintiff or whether it is instead possessed by the bargaining unit as a whole.

20 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 55.60, at 279 (4th ed. 2001) (citing Hines). We need not belabor the point: The factual allegations of G7's complaint readily establish the "uniquely personal" injury to its members necessary to sustain G7's Article III standing.

III.

Whether the district court may exercise jurisdiction under Section 301 and adjudicate G7's claim that ISA breached the CBA is another matter.[3] As preconditions to

---

[3] The Union is not an indispensable party to G7's suit. Because ISA allegedly acted unilaterally in frustrating the CBA's grievance procedure, ISA's possible liability to G7 does not depend upon any

- 10 -

suing their employers under Section 301 for breach of a CBA, employees generally must be willing to (1) exhaust the CBA's grievance procedures and (2) abide by the CBA's finality provisions.  See Garcia v. Eidal Int'l. Corp., 808 F.2d 717, 720 (10th Cir. 1986).  Subjecting an employee's Section 301 suit to such preconditions is essential because "[t]he collective bargaining system . . . of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit."  Vaca v. Sipes, 386 U.S. 171, 182 (1967).  When employees recognize a union as their exclusive bargaining representative, the rights of the individual employees so represented diminish. See id.  A CBA generally provides for the final, binding resolution of labor disputes through grievance procedures in which the union fairly represents the aggrieved employee(s). Section 301's purpose is to promote the integrity of such an agreement according to its terms.  See United Paperworkers

---

wrongdoing on the part of the Union – a point on which we subsequently expand in Part IV.  See Garcia v. Eidal Int'l Corp.,808 F.2d 717, 721 (10th Cir. 1986).  In fact, controlling precedent dictates that even if G7 had alleged such wrongdoing by the Union, G7 still would have been entitled to sue ISA and the Union separately.  See Vaca v. Sipes, 386 U.S. 171, 187 (1967);  Hayes v. New England Millwork Distribs., Inc., 602 F.2d 15, 19 n.2 (1st Cir. 1979).  Where an employee accuses both the employer and the union of wrongdoing, however, the norm is the "hybrid" action in which the employee joins both defendants in one suit.  See, e.g., Ayala v. Unión de Tronquistas de Puerto Rico, 74 F.3d 344, 345-46 (1st Cir. 1996).

Int'l Union v. Misco, Inc., 484 U.S. 29, 36-38 (1987).

In nearly every instance, "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under [the finality provisions] of collective bargaining agreements." United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 596 (1960); see UMass Mem'l Med. Ctr, Inc. v. United Food & Commercial Workers Union, 527 F.3d 1, 5-6 (1st Cir. 2008) (recognizing that a procedurally sound arbitration award is "nearly impervious to judicial oversight") (internal quotation marks omitted). Restricted judicial oversight of arbitration awards is consistent with congressional recognition that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing [CBA]." 29 U.S.C. § 173(d). Accordingly, courts have not allowed employees to challenge the underlying merits of arbitration awards by way of Section 301 absent circumstances that have impugned the integrity of the arbitration process, for instance, "fraud, deceit, or breach of the duty of fair representation or unless the grievance procedure was a 'sham, substantially inadequate or substantially unavailable.'" Harris v. Chem. Leaman Tank Lines, Inc., 437 F.2d 167, 171 (5th Cir. 1971) (per curiam).

Additionally, if employees seek judicial relief against an employer under Section 301 before the union has at least attempted to exhaust the CBA's dispute resolution procedures on their behalf, the employer may raise the defense of failure to exhaust contractual remedies. See Vaca, 386 U.S. at 184. This too is an "important qualification" on an employee's right to prosecute a Section 301 claim against an employer. Hayes v. New England Millwork Distribs., Inc., 602 F.2d 15, 18 (1st Cir. 1979). But neither is this precondition upon an employee's Section 301 suit unlimited. "[F]ull exhaustion is not inevitably required by a court before it will exercise jurisdiction under § 301." Id. Consistent with Supreme Court precedent, we have recognized three occasions when a court may exercise jurisdiction over an employee's Section 301 suit against an employer absent complete exhaustion of contractual remedies because circumstances have impugned the integrity of the arbitration process: where (1) "the union has the sole power to invoke the grievance procedures and the union wrongfully refuses to process or perfunctorily handles the grievance;" (2) "the employer repudiates the grievance procedures;" or (3) "resort to the grievance procedures would be futile." Cabarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc., 822 F.2d 188, 192 (1st Cir. 1987). Absent an allegation of at least one of these three exceptions to Section 301's

- 13 -

exhaustion requirement, an employee's Section 301 complaint may not survive an employer's motion to dismiss based on the failure to exhaust contractual remedies.

IV.

Of course, in this case we are concerned principally with the second exception to Section 301's exhaustion requirement. G7 claims entitlement to Section 301 review because, according to the complaint, ISA repudiated the arbitration provisions of the CBA when it entered into a "sham, secret agreement" with G3, thereby inducing the arbitrator to issue an award favorable to G3 absent the participation of the Union or G7, all in breach of the CBA. According to G7, ISA cannot now invoke as a defense to suit the very grievance procedures of the CBA by which it failed to abide in the first place. We agree that ISA's alleged conduct is suspect because the claim "of a sham transaction, in the sense of being both covert and in bad faith, implies a determination to repudiate the [relevant provisions of the] contract and thereby avoid arbitration." Garcia, 808 F.2d at 721. In Vaca, the Supreme Court recognized an individual employee's right to secure judicial review of a Section 301 breach of contract claim despite the failure to exhaust contractual remedies where the employer by its conduct repudiated the very procedures necessary to ensure the realization of those remedies:

- 14 -

An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures . . . . In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

Vaca 386 U.S. at 185.[4]

ISA submits it is willing to arbitrate G7's grievance over seniority rights consistent with the terms of the CBA, and that means with the Union as G7's exclusive bargaining representative. But an employer who by its conduct repudiates a promise to arbitrate a dispute consistent with the terms of the CBA has no subsequent right to insist on arbitration. See 6A Arthur L. Corbin, Corbin on Contracts § 1443, at 434-35 (1962). Rather, if the employer denies the existence or the scope of its alleged repudiation in a Section 301 suit and moves for dismissal of the action based

---

[4] Mutual promises to arbitrate a dispute are the agreed equivalents of each other. A repudiation by one party of his promise to arbitrate discharges the duty of the other party to perform his reciprocal promise . . . . This is true, even though the provision for arbitration is only a part of a larger contract such as a collective bargain between an employer and his employees.

10 John E. Murray Jr. & Timothy Murray, Corbin on Contracts § 972, at 102 (Cum. Supp. 2009) (interim edition).

- 15 -

on the failure to exhaust contractual remedies, the issue raised is for the court after appropriate inquiry into the circumstances. See id. § 1443, at 435. In Drake Bakeries, Inc. v. Am. Bakery & Confectionery Workers Int'l, 370 U.S. 254, 262-63 (1962), the Court told us: "[I]n determining whether one party has so repudiated his promise to arbitrate that the other party is excused, the circumstances of the claimed repudiation are critically important."[5]

---

[5] Given the final and binding nature of the arbitration award granting G3 seniority rights, we are also justifiably concerned at this point about the futility of arbitrating G7's claim to seniority rights. See Glover v. St. Louis-San Francisco Ry. Co., 393 U.S. 324, 330 (1969)(recognizing the futility exception to Section 301's exhaustion requirement). Just as courts may inquire into their prior judgments for fraud, we do not dismiss out of hand the idea that arbitrators too may inquire into their prior awards. See generally 9 Tim Bornstein, Ann Gosline, & Marc Greenbaum, Labor and Employment Law § 226.06[1], at 226-33 (2009) (addressing claim preclusion in the context of a prior arbitration award). Nonetheless, the arbitration award G7 seeks to set aside ostensibly rests on a settlement agreement between the "parties" to the CBA. Those parties, as the district court recognized, are ISA and the Union. The final award determined the seniority rights of G3, and thus necessarily those of G7. On its face, that award binds ISA and the Union. Assuming the allegations of the complaint to be true, that award, if allowed to stand, may effectively gag the Union. As to the merits of G7's claim to seniority, nothing at this point appears left to arbitrate. The arbitrator, allegedly duped, has made his decision in favor of G3, to the detriment of G7. See Corbin, supra § 1443, at 436 (recognizing "that a breach may be of a kind that destroys the end and aim of the arbitration provision itself").

We have no quarrel with the Supreme Court's statement in Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry, 494 U.S. 558, 564 (1990), referred to by the district court, that due to the finality provisions usually contained in a CBA, "an employee normally cannot bring a § 301 action against an employer unless he can show that the union breached its duty of fair representation in its handling of the grievance." (emphasis added). As the array of precedents illustrate, Chauffeurs speaks to the usual Section 301 scenario. In such scenario, the employer is alleged to have breached the CBA by taking some adverse action against the employee unrelated to the CBA's grievance provisions. In that case, the employer's misconduct has not impugned the arbitration process. Rather, the union's alleged mishandling of the employee's grievance has impugned the process. These were the circumstances that led the Supreme Court in Vaca to comment prior to Chauffeurs that in order to succeed in a breach of contract action against the employer, the employee must prove the union breached its duty of fair representation in processing the grievance. See Vaca, 386 U.S. at 185-87. Without proof of the union's misconduct, the arbitration process has not been jeopardized and courts, as we have explained, are loathe to interfere in labor relations and review the substantive merits of an employee's grievance.

- 17 -

But the Court in <u>Vaca</u> also recognized a second, much rarer, instance where an employee could maintain a Section 301 suit against an employer for breach of a CBA, namely where the employer through its conduct repudiates the applicable provisions of the CBA. The district court never cited <u>Vaca</u> or addressed G7's allegations of repudiation. <u>Vaca</u> recognized that circumstances may arise, like those alleged here, where the union has <u>not</u> wrongfully refused to process the employee's grievance, and thus the employee has no cause of action against the union for breach of the duty of fair representation. But such circumstances do not in themselves foreclose the employee's breach of contract action against the employer under Section 301. <u>See</u> <u>Vaca</u>, 386 U.S. at 185. And whether the employer repudiates the CBA to avoid arbitration or fraudulently procure an arbitration award ostensibly agreed to by the employer and the union, while bearing upon the remedy sought, has no bearing upon the availability of the employee's cause of action against the employer for breach of the CBA under Section 301.

V.

This appeal in the end is about the fundamental fairness of the arbitration <u>process</u>. As alleged in G7's complaint, ISA is solely responsible for the failure of the arbitration process because it repudiated those very provisions of the

- 18 -

CBA designed to ensure a fair process. Vaca teaches that we should not allow ISA to hide behind the very provisions of the CBA it has allegedly repudiated. Rather, Vaca suggests that ISA is estopped from utilizing the CBA (as well as the consequent award) to shield itself from answering G7's factual allegations. We therefore hold, based upon the applicable law, that the factual allegations of G7's complaint are sufficient to withstand ISA's motion to dismiss. Given the factual allegations buttressing G7's claim that ISA and G3 entered into a "sham secret agreement" whereby ISA breached the CBA and repudiated the CBA's grievance procedures, the issue of whether the integrity of the process has been so impugned as to call into question the validity of the arbitration award remains for judicial resolution.[6]

Importantly, we do not read G7's complaint as a direct challenge to the arbitrator's substantive determination that

---

[6] A different conclusion might leave G7 without legal recourse absent the Union's decision in this case to seek judicial relief. Without deciding the scope of the Union's duty to fairly represent G7, we wonder whether a decision on the part of the Union not to seek judicial relief would suggest the Union had breached its duty of fair representation when the Union, as exclusive bargaining agent for both G3 and G7, apparently bent over backwards in its effort to inform both ISA and the arbitrator of its objection to any agreement absent the participation of all interested parties. Certainly nothing in the record before us suggests the Union has wrongfully refused to process G7's grievance.

G3 is entitled to seniority rights over G7. The complaint does not request a substantive merits review of the arbitrator's final decision, and wisely so, because, as we have seen, that review would be "very limited," perhaps even more so in G3's absence. Because the agreement between ISA and the Union is to submit irresolvable grievances over seniority rights to arbitration, a court generally has "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." United Steelworkers v. Am. Mfg. Co., 363 U.S. 564, 567 (1960).

Rather, G7's complaint challenges the process through which the arbitrator reached such decision as contrary to the remedial procedures outlined in the CBA. In the complaint, G7 recognizes that the dispute between G7 and G3 over seniority "must be resolved with the presence and participation of [G7] and [G3], in accordance with the terms and conditions established by the Board of Directors of the Union." To that we add "so long as those terms and conditions are consistent with the applicable provisions of the CBA." In other words, G7 appears quite willing to permit ISA and the Union to arbitrate its member employees' grievances over seniority rights in a fundamentally fair

- 20 -

process, that is, with the participation of both G3 and G7.[7]

G7's position accords with the sound view that even where

procedural aberrations have tainted an arbitration award,

> as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that

---

[7] According to the complaint, G3 and G7 assigned to ISA and the Union through the CBA the task of resolving the two groups' differences. The Union may not be pushed aside simply because the problem posed is between two groups of member employees. "'By its selection as bargaining representative, [the union] has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially.'" Humphrey v. Moore, 375 U.S. 335, 342 (1964). "Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance process." Id. at 349-50. Notably, Humphrey also involved a dispute over seniority rights between two groups of union employees. The Court was not troubled by the fact that the same union was bound to represent both groups under the terms of the CBA:

> [W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another . . . . The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

Id. at 349.

- 21 -

> the parties bargained for in the collective-bargaining agreement.  Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement.

Misco, 484 U.S. at 40-41 n.10.

If on remand G7's allegations ultimately prove accurate, the district court should fashion a remedy not inconsistent with the foregoing.  In that event, any damage determination based upon ISA's breach of the CBA must await resolution of the underlying seniority rights' dispute between G3 and G7.

REVERSED and REMANDED.